**Douglas D. CHAPPEE,
Petitioner, Appellee,**

v.

**George VOSE, et al.,
Respondents, Appellants.**

No. 87–1286.

United States Court of Appeals,
First Circuit.

Heard Nov. 5, 1987.

Decided March 28, 1988.

Paula J. DeGiacomo, Asst. Atty. Gen., Crim. Appellate Div., with whom James M.

Shannon, Atty. Gen., and A. John Pappalardo, Deputy Atty. Gen., Chief, Crim. Bureau, Boston, Mass., were on brief, for respondents, appellants.

Kimberly Homan with whom Zalkind, Sheketoff, Homan, Rodriguez & Lunt, Boston, Mass., was on brief, for petitioner, appellee.

Before COFFIN, TORRUELLA and SELYA, Circuit Judges.

SELYA, Circuit Judge.

Appellants, state correctional officials, ask us to reverse an order of the United States District Court for the District of Massachusetts granting habeas corpus relief to petitioner-appellee, Douglas D. Chappee. In our view, the recent decision in *Taylor v. Illinois*, — U.S. —, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988)—a case decided by the Supreme Court after we heard oral argument in this matter—constrains us to oblige.

## I. BACKGROUND

The details of Chappee's state court conviction for trafficking in cocaine have been memorialized both on direct appeal and in the federal district court. *See Commonwealth v. Chappee*, 492 N.E.2d 719 (Mass. 1986) (*Chappee I*); *Chappee v. Commonwealth*, 659 F.Supp. 1220 (D.Mass.1987) (*Chappee II*). We need not iterate the expository factual treatment which has gone before. *E.g., Chappee I*, 492 N.E.2d at 720–24; *Chappee II*, 659 F.Supp. at 1221. Rather, we recount here only the features of the case directly relevant to the purpose at hand.

In July 1983, police conducted a warrant-backed search of petitioner's home which turned up nearly 140 grams of cocaine. Chappee was thereupon charged with various drug offenses in state superior court. During the course of routine pretrial skirmishing, Chappee's counsel executed a pretrial conference report (PCR) in which he "agreed to provide the Commonwealth in

writing … the names and addresses of proposed witnesses" by October 21, 1983. As counsel well knew, under Massachusetts law this agreement was "binding on the parties and … [on] the subsequent course of the proceeding." Mass R.Crim.P. 11(a)(2)(A). Nevertheless, when trial got underway in October 1984, the Commonwealth had not been notified about any defense witnesses.

Petitioner waived a jury. At the bench trial, the prosecution introduced evidence through a state chemist, Gagnon, that the white powder seized from Chappee's home contained 72% cocaine and was a Class B controlled substance within the meaning of the statutes under which defendant had been charged. *See* Mass.Gen.Laws c. 94C, §§ 32E(b)(2), 32A(a) (1984). On cross-examination, one of Chappee's attorneys, Theodore Simon, grilled Gagnon as to how the powder had been tested, insinuating that the particular tests could not distinguish cocaine L (a controlled substance derived from the coca leaf) from cocaine D (a compound theoretically susceptible of synthetic production, not chemically equivalent to cocaine L, and presumably, not controlled). *See United States v. Orzechowski*, 547 F.2d 978, 980–81 & n. 2 (7th Cir. 1976) (discussing legal significance, under federal drug laws, of differences between cocaine L and cocaine D), *cert. denied*, 431 U.S. 906, 97 S.Ct. 1701, 52 L.Ed.2d 391 (1977). In this fashion, Simon attempted for the first time to introduce an "isomer defense" aimed at casting doubt on whether the trafficked substances were "controlled," that is, proscribed by state drug laws.[1] Gagnon would not yield the point; he testified that the tests performed were "generally accepted by the scientific community as appropriate tests for 'cocaine' … [though] within the scientific community there is a division of opinion on whether those tests can distinguish between cocaine L and cocaine D." *Chappee I*, 492 N.E.2d at 722.

---

1. The mechanics of the isomer defense (or isomer strategy, as it is sometimes known) have been exegetically discussed by us and by our sister circuits. *See, e.g., United States v. Fran-*

*cesco*, 725 F.2d 817, 820–22 (1st Cir.1984); *United States v. Bockius*, 564 F.2d 1193, 1194–96 (5th Cir.1977). We see no need to repastinate that familiar soil.

As the chemist's testimony drew to a close, Simon sought the court's permission to call three defense experts. The tactic was obviously preplanned; the witnesses, who came from distant points outside New England, were ensconced in the back of the courtroom. Counsel represented the coterie of scientists as prepared to testify that, although cocaine L is a controlled substance derived from the coca plant, other cocaine isomers (like cocaine D) are neither identical nor equivalent, and are not proscribed in the same manner. The trio would also swear, counsel said, that Gagnon's tests were inadequate to distinguish cocaine L from other isomers. In fine, as the Massachusetts Supreme Judicial Court (SJC) noted, "the defendant's experts proposed only to challenge the efficacy of the Commonwealth's testing procedures, rather than to express their own opinion of the composition of the substance." *Id.* at 725. The prosecution objected strenuously. It knew nothing of these savants, the defense had not served notice of intention to call a single witness (let alone three experts), and the proffer mocked applicable standards mandating reciprocal discovery.[2] Nor could Chappee credibly claim surprise; the prosecutor stated, without contradiction, that the Commonwealth had produced Gagnon as a witness not for its own benefit, but "strictly as a courtesy to the defense." *Id.* at 723.

The superior court justice did not mince words. He found that "as a matter of fact ... the defense [had] not acted in good faith; that it [had] deliberately withheld the names of these expert witnesses for the purpose of lulling the Commonwealth into security and ... creating unfair prejudice to the disadvantage of the Commonwealth in this case." The judge thereupon rejected the proffer. *See* Mass.R.Crim.P. 14(c)(2) (trial judge "may in his discretion exclude evidence for noncompliance with a discovery order"). Chappee presented no defense witnesses. He was found guilty.

On direct appeal, petitioner claimed that preclusion of the experts' testimony trammelled his right to present a defense as secured by the sixth amendment to the federal Constitution. The SJC disagreed, holding preclusion appropriate under the circumstances. *Chappee I,* 492 N.E.2d at 724–25. It affirmed the trafficking conviction. *Id.* at 728. After examining Chappee's habeas application, however, the federal district court ruled that exclusion of the experts' testimony contravened the sixth amendment. *Chappee II,* 659 F.Supp. at 1224–30.

## II. PRECLUSION AS A SANCTION

Federal courts exercise no roaming superintendence over state judicial proceedings. *Smith v. Phillips,* 455 U.S. 209, 221, 102 S.Ct. 940, 948, 71 L.Ed.2d 78 (1982); *Lefkowitz v. Fair,* 816 F.2d 17, 23 (1st Cir.1987). In habeas jurisdiction, we are to "review state convictions solely for error of constitutional stature." *Puleio v. Vose,* 830 F.2d 1197, 1204 (1st Cir.1987), *petition for cert. filed* (Jan. 23, 1988). In the last analysis, we look not to the desirability of a particular state court ruling or practice in utopian terms, but only to its constitutional implications.

A. *Availability of the Sanction.* The Compulsory Process Clause of the sixth amendment guarantees every criminal defendant "the right ... to have compulsory process for obtaining witnesses in his favor...." Its strictures apply to the states through the fourteenth amendment. *Washington v. Texas,* 388 U.S. 14, 17–19, 87 S.Ct. 1920, 1922–23, 18 L.Ed.2d 1019 (1967); *Pointer v. Texas,* 380 U.S. 400, 403, 85 S.Ct. 1065, 1067, 13 L.Ed.2d 923 (1965). The guarantee, we are quick to affirm, is a fundamental one. *See Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973).

---

**2.** By express cross-reference, the PCR incorporated Mass.R.Crim.P. 14(a)(3). That rule provided in relevant part:

If the judge grants discovery or inspection to a defendant ..., the judge may upon motion by the Commonwealth condition his order by requiring the defendant to permit the Commonwealth to discover ... the names, addresses, and statements of those persons whom the defendant intends to use as witnesses at trial.

Mass.R.Crim.P. 14(a)(3).

Be that as it may, the constitutional right to compulsory process is not absolute. "The Sixth Amendment does not confer the right to present testimony free from the legitimate demands of the adversarial system...." *United States v. Nobles*, 422 U.S. 225, 241, 95 S.Ct. 2160, 2171, 45 L.Ed. 2d 141 (1975). *See also Chambers*, 410 U.S. at 295, 93 S.Ct. at 1046 (right of confrontation "is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process"). Indeed, the Court has recently held that, although this precious constitutional right can be offended by too free use of "a discovery sanction that entirely excludes the testimony of a material defense witness," *Taylor v. Illinois*, 108 S.Ct. at 653, the sixth amendment does not altogether prohibit preclusion of such testimony:

> It is elementary, of course, that a trial court may not ignore the fundamental character of the defendant's right to offer the testimony of witnesses in his favor. But the mere invocation of that right cannot automatically and invariably outweigh countervailing public interests.

*Id.* at 655. Procedural rules mandating pretrial disclosure of witness lists—so long as seasonably promulgated, evenly balanced, and rationally related to the trial process—are at the core of the public interest. This is so precisely because such rules are, by their very nature, "designed to vindicate the principle that the 'ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts.'" *Id.* at 653 (quoting *United States v. Nixon*, 418 U.S. 683, 709, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974)).

■ It follows, then, that an accused's right to present a defense—his right to "compulsory process"—may be limited in instances where he has figuratively thumbed his nose at applicable requirements of pretrial discovery. Inasmuch as "[t]he very nature of the right requires that its effective use be preceded by deliberate planning and affirmative conduct," *Taylor v. Illinois*, 108 S.Ct. at 653, it balances the equation neatly to hold the de-

fense to the condign consequences of a premeditated flouting of the rules. After all:

> The principle that undergirds the defendant's right to present exculpatory evidence is also the source of essential limitations on the right. The adversary process could not function effectively without adherence to rules of procedure that govern the orderly presentation of facts and arguments....

*Id.* Thus, whereas measures short of preclusion may be "adequate and appropriate in most cases," *id.* at 655, preclusion is a constitutionally permissible judicial response to a sufficiently serious discovery violation.

*Taylor* is, in many salient respects, strikingly similar to the case at bar. Its teachings serve to narrow the lens of our inquiry measurably. Because the sixth amendment does not forbid judicious use of preclusion as a counteractant to a failure to make discovery, the question before us is not whether the sanction employed in Chappee's case was the remedy we would have chosen, or even whether we think such a remedy harsh. Our only legitimate inquiry is whether preclusion was so stiff a sanction, on the facts of this case, as to offend the Constitution.

B. *The Balancing Test.* We turn to the opinion below. The district court balanced Chappee's right to present a defense against the need to obey discovery rules and found an infringement of the former. *Chappee II*, 659 F.Supp. at 1227–30 & n. 10. In reaching that conclusion, the court considered,

> (1) whether the discovery violation was willful or in bad faith; (2) the materiality of the evidence excluded; (3) the extent to which the prosecution will be surprised or prejudiced; (4) the effectiveness of less severe sanctions; and (5) whether the defendant himself knew of or cooperated in the discovery violation.

*Id.* at 1223 (footnote omitted). The district judge acknowledged that the state court's findings of surprise and of defense counsel's bad faith were inexpugnable, *id.* at

1224–25, but believed it to be unclear "that alternative sanctions could not have minimized the prejudice." *Id.* at 1225. And the district court, impressed that nothing in the record suggested complicity between Chappee and his attorneys, found it unreasonable to deprive a defendant who was not personally to blame for hiding the witnesses' identities of his right to present a defense. *Id.*

The district court wrote, of course, without the guidance of *Taylor.* With the benefit of hindsight, it is evident that the shape and contours of the applicable criteria are built to a somewhat different last. Although the *Taylor* Court declined to cast a mechanical standard to govern all possible cases, it established that, as a general matter, the trial judge (in deciding which sanction to impose) must weigh the defendant's right to compulsory process against the countervailing public interests: (1) the integrity of the adversary process, (2) the interest in the fair and efficient administration of justice, and (3) the potential prejudice to the truth-determining function of the trial process. *Taylor v. Illinois,* 108 S.Ct. at 655 & n. 19. The judge should also factor into the mix the nature of the explanation given for the party's failure seasonably to abide by the discovery request, the willfulness *vel non* of the violation, the relative simplicity of compliance, and whether or not some unfair tactical advantage has been sought. *Id.* at 655–56 & nn. 20–21.

In the Court's blueprint for the design of a weighbridge, it has been made clear that lack of complicity between attorney and client—a fact which the district court in this case found decisive—is of scant significance. *Taylor* instructs that the client's connivance is not a necessary concomitant to employing a preclusive sanction:

... [T]he lawyer has—and must have—full authority to manage the conduct of the trial. The adversary process could not function effectively if every tactical decision required client approval. Moreover, given the protections afforded by the attorney-client privilege and the fact that extreme cases may involve unscrupulous conduct by both the client and the lawyer, it would be highly impracticable to require an investigation into their relative responsibilities before applying the sanction of preclusion.... Whenever a lawyer makes use of the sword provided by the Compulsory Process Clause, there is some risk that he may wound his own client.

*Id.* at 657.

The district court's heavy reliance on the availability and effectiveness of other sanctions, *Chappee II,* 659 F.Supp. at 1225, 1227–28 & n. 10, was also undermined by *Taylor.* Though recognizing that a trial judge always has the option of utilizing sanctions milder than an embargo (*e.g.,* granting a continuance or mistrial, levying fines, or instituting disciplinary proceedings), the Court left no doubt that such alternatives will certainly "be less effective than the preclusion sanction and that there are instances in which they would perpetuate rather than limit the prejudice to the State and the harm to the adversary process." *Taylor v. Illinois,* 108 S.Ct. at 655. If it appears to the trial judge that the party's failure to comply with a routine discovery obligation

was willful and motivated by a desire to obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence, it would be entirely consistent with the purposes of the Confrontation Clause simply to exclude the witness' testimony.

*Id.* at 656. The Court's frank assessment of the demonstrably greater utility of a sanction debarring testimony stands in stark contrast to the district court's expressed belief "that a preclusion order is no more effective than other available sanctions." *Chappee II,* 659 F.Supp. at 1225 (citation omitted).

C. *Reweighing the Equities.* From what we have said thus far, it is plain that the district court calibrated the scales in a manner at odds with what *Taylor* has since taught. We thus reweigh the elements which appear in the state court record, cognizant withal of the deference which a federal habeas tribunal owes to state

courts' findings of fact. *See Sumner v. Mata*, 449 U.S. 539, 547–52, 101 S.Ct. 764, 769–72, 66 L.Ed.2d 722 (1981); *Tavares v. Holbrook*, 779 F.2d 1, 3 (1st Cir.1985). *See generally* 28 U.S.C. § 2254(d).

In *Taylor*, the Court held that the preclusion sanction was appropriately levied. We find the case illustrative of the intended operation of the rule of decision, and so examine the circumstances. There, defense counsel, on the second day of trial and after the prosecution's principal witnesses had testified, moved to amend a discovery response to name two more witnesses. (One of these "new" witnesses never appeared, and the dispute as to preclusion focused exclusively on the remaining witness, one Wormley; for simplicity's sake, we will treat with *Taylor* as if only Wormley's testimony had been proffered.) The attorney's explanation for the lateness alluded to some supposed difficulty in locating Wormley. But at voir dire this myth was exploded; it became evident, among other things, that defense counsel had visited Wormley a week earlier. After finding counsel's conduct to constitute a blatant violation of applicable discovery rules and denying the defendant an opportunity to bring Wormley's testimony before the jury on that ground, the trial judge also noted, "for whatever value it is," his doubts about the witness's veracity. *Taylor v. Illinois*, 108 S.Ct. at 650. As we have mentioned, the Court upheld the preclusion. *Id.* at 657.

■ There is, in our view, no principled way to distinguish the present case from *Taylor*. Here, as in *Taylor*, defense counsel's explanation for failing to inform the prosecution of the witnesses' existence was lame.[3] The trial judge's rejection of it and his determination that the defense obviously "knew well in advance the technical is-

sues that might come up and of [the] obligation under the pretrial conferences report to file a notice of proposed expert testimony," *Chappee I*, 492 N.E.2d at 723, are firmly rooted in the record. Such findings cannot be secondguessed on habeas review. *See Rushen v. Spain*, 464 U.S. 114, 120, 104 S.Ct. 453, 456, 78 L.Ed.2d 267 (1983) (per curiam) (state courts' factfinding to be set aside only if not fairly supported by the record); *Campbell v. Fair*, 838 F.2d 1, 2–3, 5 (1st Cir.1988) (deference owed to state courts' findings extends to inferences reasonably drawn from underlying facts). Here, as in *Taylor*, the discovery violation was lurid and unequivocal, and its genesis was inexcusably deliberate. As the superior court found, Chappee's lawyers "willfully and flagrantly failed to comply with the rule of continuing disclosure." Such clear and unambiguous findings deserve substantial deference in this proceeding.[4]

It is likewise clear that this, like *Taylor*, was a case in which the defendant could have satisfied the applicable discovery rules with ease. This was not a situation where the defense had no way of knowing until midnight loomed of the existence of a witness or the need for certain testimony; the defense had been told by the prosecution many months before trial of the nature of the tests performed on the powder. Moreover, the chemist's report had been exchanged in the course of pretrial discovery.

This equally was not a situation where the rules in question were abstruse, onerous, or burdensome. Quite the opposite was true. Like *Taylor*, this matter began with the most routine of discovery initiatives. Both requests involved simple witness identification protocols, commonplace in nature and straightforward in applica-

---

**3.** In this case, the lawyer claimed "that the witnesses were in court to advise counsel and that their testimony only was made necessary by inaccuracies in the testimony of Gagnon." *Chappee I*, 492 N.E.2d at 723. Given the circumstances, this answer was plainly disingenuous. Not only were the witnesses present in the courtroom and counsel armed to the teeth for the cross-examination, but the lawyer had prepared a legal memorandum for submission to

the judge dealing with their expected testimony. *Id.* Petitioner's habeas counsel has had the grace to abandon any pretense that defense counsel was taken by surprise.

**4.** We note that the federal district judge, though ruling in Chappee's favor, characterized the actions of defense counsel as "egregious." *Chappee II*, 659 F.Supp. at 1224.

tion. *Compare, e.g.,* Mass R. Crim P. 14(a)(3), quoted in pertinent part *supra* at note 2, *with* Illinois Sup.Ct.Rule 413(d), quoted in pertinent part in *Taylor,* 108 S.Ct. at 649 n. 2. The defense's agreement to provide the prosecution with the names and addresses of all witnesses it intended to call was explicit. Chappee knew—or was chargeable with knowledge—of court rules which made that agreement binding. *See* Mass.R.Crim.P. 11(a)(2)(A). And the duty which devolved from the PCR was a continuing one. *See* Mass.R.Crim.P. 14(a)(4) ("If either party subsequently learns of additional material which he would have been under a duty to disclose or produce ... at the time of a previous discovery order, he shall promptly notify the other party ... and shall disclose the material in the same manner as required for initial discovery...."). In short, the defense—with eyes wide open—swaggered venturesomely into a jungle of its own cultivation.

In this matter, as in *Taylor,* the "truth-determining function" of the trial process was grievously at risk. Although Chappee argues that Taylor, unlike himself, desired to present testimony of dubious provenance, the distinction is not a critical one. Telling the truth seems a simple exercise. Yet determining the truth is a complicated business, and its achievement can be thwarted as easily by "springing" surprise testimony on an unsuspecting opponent— especially surprise testimony of a highly technical nature—as by presenting perjured testimony. *Cf. Taylor v. Illinois,* 108 S.Ct. at 654 (pretrial discovery "minimizes the risk that a judgment will be predicated on incomplete [or] misleading ... testimony"); *id.* at 655 (court may reasonably "presume that there is something suspect about a defense witness who is not identified until after the eleventh hour has passed"). Here, perhaps more evidently than in *Taylor,* concealing the witnesses' identities could only be thought "motivated by a desire to obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence." *Id.* Once the Commonwealth had been cradle-sung into a

false sense of security, and Gagnon subjected to cross without fair warning of the nature of the defense, Chappee's chances of success—admittedly slim at best—were (unfairly) maximized. Such buccaneering cannot be countenanced. As Justice Powell wrote, "one cannot invoke the Sixth Amendment as a justification for presenting what might have been a half-truth." *United States v. Nobles,* 422 U.S. at 241, 95 S.Ct. at 2171.

There are important similarities, too, between the spillways which spawned this case and *Taylor,* respectively. In *Taylor,* the Court noted approvingly that the Illinois courts used the preclusion sanction judiciously, reserving it for the exceptional instance "where the uncooperative party demonstrates a deliberate contumacious or unwarranted disregard of the court's authority." *Taylor v. Illinois,* 108 S.Ct. at 657 n. 23 (quoting *People v. Rayford,* 43 Ill.App.3d 283, 1 Ill.Dec. 941, 944, 356 N.E. 2d 1274, 1277 (1976)). It is, we think, significant that the case at bar arises in a system, and under a set of circumstances, fully consistent with the *Taylor* benchmark. In Massachusetts, the power to issue an evidentiary embargo inheres under Mass.R.Crim.P. 14, which authorizes such stern measures to combat noncompliance with discovery orders or agreements such as those contained in a PCR. *See* Mass.R. Crim.P. 14(c)(2) (judge may "in his discretion exclude evidence for [discovery] noncompliance"). Like Illinois, however, Massachusetts invokes preclusory sanctions only in extreme cases. *See, e.g.,* Mass.R. Crim.P. 14, Reporter's Notes, subdivision (c) ("A court should only employ this sanction ... when convinced that a failure to comply with an order was deliberate and prejudicial to the Commonwealth."). There is nothing before us to indicate that so harsh a sanction is employed wantonly or in a profligate manner by the Commonwealth's courts.

*Taylor,* as we read it, does not open the floodgates for the administration of criminal justice *in terrorem.* Exclusionary sanctions must appropriately be reserved for hard-core transgressions. Yet trial

judges are in the front lines. They must constantly struggle to hold the balance of equities steady and true. Often, this task is made the harder because the prosecutor or defense counsel (or both) throw good sense to the winds and elect to play a win-at-any-cost game. For that reason, trial courts should usually be afforded the full leeway which the Constitution allows in diagnosing infractions and in prescribing remediation. This dose of discretion, it seems to us, is particularly due to state trial courts when captured in the special wide-angle focus of federal habeas review. *Cf., e.g., Ristaino v. Ross*, 424 U.S. 589, 597 n. 9, 96 S.Ct. 1017, 1022 n. 9, 47 L.Ed.2d 258 (1976) (state court's refusal of voir dire inquiry passes muster in habeas case because not constitutionally required even though, on direct appeal, Supreme Court would have required a federal court faced with identical circumstances to make the inquiry).

In the case at bar, the defense's unremitting failure to comply with the strictures of the PCR (or the duties of reciprocal and ongoing disclosure, for that matter) justified the imposition of the preclusion sanction because the conduct was a deliberate and calculated ploy, prejudicial to the government's litigation stance, and menacing to the very integrity of the adversary process. That the noncompliance was intentional and premeditated necessitates no further editorialization. *See supra* at 30–31 & nn. 3–4. As to prejudice, we need do little more than quote the SJC:

> The judge's finding that the surprise was unfairly prejudicial to the Commonwealth was also well justified. In view of the scientific sophistication of the expected testimony of the witnesses, the prosecutor reasonably could not have been expected to conduct effective cross-examination or to have rebuttal evidence available.

*Chappee I*, 492 N.E.2d at 725.

To be sure, petitioner argues that the prejudice which inhered to the prosecution could have been minimized to some extent by jockeying the trial schedule—say, by granting a lengthy continuance, permitting the prosecution to enlist new experts of its own, declaring a mistrial, or the like. Yet we will not engage in such Monday morning quarterbacking. A defendant who elects willfully to subvert the rules is in a peculiarly awkward position to insist that the trial court must engage in extravagant contortions to attempt to extricate him from a self-dug hole. The Constitution, we believe, does not tie the judiciary's hands as tightly as Chappee suggests. If state courts are to retain an ability to preserve their orderly functioning, then they must be permitted to act decisively in aggravated cases like this one. Elsewise, "[t]he trial process would be a shambles." *Taylor*, 108 S.Ct. at 653.

It seems to us that, given the cutthroat tactics employed by the defense in this case, the state court acted well within the bounds of both the Constitution and its discretion in excluding the testimony. The court's vital interest in preserving the integrity of the adversary process against the ravages of what the trial judge accurately described as attempted "trial by ambush" made such a sanction, though drastic, appropriate in this case.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

As an alternate ground for habeas relief, Chappee urges that his counsel, by failing to identify expert witnesses in a timely fashion, was ineffective. The SJC addressed this claim and noted, *inter alia*, the trial judge's finding "that defense counsel's decision to conceal the existence of his expert witnesses was a calculated tactic." *Chappee I*, 492 N.E.2d at 727. The SJC determined this finding to be predicated upon "adequate evidence," *id.*, and characterized counsel's choice as amounting to an "arguably reasoned tactical or strategic judgment[ ]." *Id.* (quoting *Commonwealth v. Rondeau*, 378 Mass. 408, 392 N.E.2d 1001, 1003 (1979)). Moreover, the SJC concluded that there was no prejudice; the record did not bear out that, had proper notice been afforded, Chappee "would have had a substantial defense of which he was deprived." *Id.* On these bases, the main prongs of the ineffective

assistance claim were blunted.[5] The federal district court did not reach the ineffective assistance claim. *See Chappee II*, 659 F.Supp. at 1220 n. 1.

The yardstick by which the quality of legal representation must be gauged vis-a-vis the Constitution is the two-part test established by the Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). That test requires a defendant to show *both* that counsel was lacking a reasonable degree of proficiency and that prejudice resulted thereby. *Id.* at 687, 104 S.Ct. at 2064. As we have just indicated, the SJC determined that petitioner passed neither half of this conjunctive test. *Chappee I*, 492 N.E.2d at 727. We need not write at great length on this point, for we agree in substance with the SJC that the superior court's finding that counsel was not deficient in the constitutional sense was a supportable one.[6]

Under the first part of the *Strickland* test, there is a strong presumption that "counsel's conduct falls within the wide range of reasonable professional assistance ... 'considered [to be] sound trial strategy....'" *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955)). That counsel's selection of a stratagem turns out to have been stupid does not render the game plan "un-

reasonable" as a matter of law. *See United States v. Bosch*, 584 F.2d 1113, 1121 (1st Cir.1978) (choice between trial tactics, though appearing plainly unwise in retrospect, not tantamount to "constitutionally-deficient representation"). So, too, the fact that counsel's scheme flouted procedural rules or was unethical does not automatically propel petitioner past the barrier. If unprofessional conduct (say, shortstopping a rule of court or subornation of perjury), deliberately employed as a means of thwarting the prosecution, was to be deemed *per se* ineffective assistance, then the accused would be placed in an idyllic situation. If counsel successfully cut the corner, the client would unfairly benefit. On the other hand, if counsel was caught in the act and the stratagem aborted, then the client could fall back on a claimed abridgement of his sixth amendment right to reasonably proficient representation. Either way, the accused would reap a windfall. The notion that this sort of "heads-I-win, tails-you-lose" approach is doctrinally required by the sixth amendment is, we suggest, "a proposition more suitable to Lewis Carroll" than to the lexicon of federal constitutional law. *See United States v. Ven-Fuel, Inc.*, 758 F.2d 741, 763 & n. 17 (1st Cir.1985), citing L. Carroll, *Alice's Adventures In Wonderland* 8–9 (Delacorte Press. ed. 1966). We emphatically decline

---

**5.** Chappee also argued to the SJC that he was denied effective assistance of counsel because his local lawyer neglected to move Simon's admission *pro haec vice*, thus enabling the trial court more easily to bar the out-of-state lawyer's continued participation in the trial when his procedural end run was thrown for a loss. *See Chappee I*, 492 N.E.2d at 727. Petitioner has not renewed that assertion before us, so we take no view of it.

**6.** The SJC also resolved the second prong of *Strickland* adversely to petitioner. *Chappee I*, 492 N.E.2d at 727. Although Chappee's failure to pass the first part of the test is issue-determinative, we note in passing that prejudice cannot be presumed merely from a lawyer's eschewal of available expert witness testimony. *See, e.g., United States v. Krohn*, 560 F.2d 293, 297 (7th Cir.), *cert. denied*, 434 U.S. 895, 98 S.Ct. 275, 54 L.Ed.2d 182 (1977). Chappee's counsel have been unable to point to a single reported case where an isomer defense was instrumental in

gaining acquittal, and our independent research has been similarly unavailing. The defense, though ingenious, seems to have been widely rejected. *See, e.g., United States v. Francesco*, 725 F.2d at 820 n. 1 (collecting cases); *United States v. Fince*, 670 F.2d 1356, 1357–58 (4th Cir.) (describing isomer defense as "meritless" and deserving of summary rejection), *cert. denied*, 456 U.S. 982, 102 S.Ct. 2254, 72 L.Ed.2d 860 (1982); *but cf. United States v. Ross*, 719 F.2d 615, 617–18 (2d Cir.1983) (new trial required because of instructional error touching upon isomer defense). We note, too, that Congress amended the federal narcotics laws in 1984 to afford the isomer strategy a decent burial. Comprehensive Crime Control Act of 1984, Pub. L. No. 98–473, Tit. II, § 507(a), (c), 98 Stat. 1976, 2071 (1984); *see United States v. Puglisi*, 790 F.2d 240, 242 & n. 1 (2d Cir.1986) (per curiam). The statutory definitions of "controlled substances" in effect in Massachusetts when petitioner's crimes were committed, however, had not been similarly amended.

petitioner's invitation that we adopt such a surreal rule.

In this case, the state courts' finding that defense counsel's concealment of the expert witnesses was a planned maneuver enjoys abundant record support and is entitled to deference. *Rushen v. Spain*, 464 U.S. at 120, 104 S.Ct. at 456; *Sumner v. Mata*, 449 U.S. at 547–51, 101 S.Ct. at 769–71. Chappee, of course, was bound by such a forethought tactical decision. *See Taylor v. Illinois*, 108 S.Ct. at 657. The strategy was, as the SJC put it, "arguably reasoned." Defendant had been caught red-handed with a king-size quantity of contraband. His attempts to invalidate the search or suppress its fruits had proven bootless. His isomer defense, such as it was, had not enjoyed much success in other cases. *See supra* note 6. In terms of the likely outcome of trial, his circumstances can best be described as desperate.

In this parlous situation, counsel could well have reasoned that only some back-alley trick—an attempt, say, to ambush the prosecution by disregarding procedural niceties—had a chance to carry the day. If the prosecution and its chemist were caught unaware, perhaps even so fragile a straw as the isomer strategy might carry the day. As the SJC wryly noted, "[t]he tactic might well have succeeded were it not for the decisiveness of a seasoned judge." *Chappee I*, 492 N.E.2d at 727. Unwise and unscrupulous though it may have been, we cannot conclude as a matter of federal constitutional law that the strategy was entirely outside the "wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065.

## IV. CONCLUSION

With the enlightenment of *Taylor v. Illinois*, it is now clear that the sixth amendment does not bar preclusion of testimony in a criminal case as a sanction for the deliberate disregard of procedural rules. Indeed, *Taylor* underscores the legitimacy of embargo orders when failure to ban the testimony "would perpetuate rather than limit the prejudice to the State and harm to

the adversary process." *Taylor v. Illinois*, 108 S.Ct. at 655. Here, the state's rules were reasonable, the means of compliance readily at hand, the violations willful, and the prejudice to the prosecution palpable. The integrity of the truth-determining function was placed sufficiently at risk. In levying a prohibitory sanction as a counterweight to baldfaced defiance of the rules, the state trial judge acted in a manner consistent with the sixth amendment's Compulsory Process Clause. The imposition of an exclusionary sanction in response to so egregious a violation was not constitutionally offensive.

We need go no further. Because rejection of Chappee's belated effort to name and call expert witnesses was not error of constitutional magnitude, and because petitioner's counsel, though sailing much too close to the wind, was not "ineffective" in the constitutional sense, federal habeas relief was inappropriate. Accordingly, the writ granted below must be quashed and the judgment of the federal district court

*Reversed.*