UNITED STATES of America, Plaintiff,

v.

Victor LEVY CORDERO, Defendant.

Crim. No. 91–299(RLA).

United States District Court,
D. Puerto Rico.

June 10, 1993.

Guillermo Gil, Sr. Trial Atty., U.S. Dept. of Justice, Guaynabo, PR, for plaintiff.

Robert L. Moore, Law Office of Moore and Rabin, P.A., Miami, FL, for defendant.

## ORDER ENTERING FINDINGS WITH RESPECT TO THE EXCLUSION OF ALIBI EVIDENCE

ACOSTA, District Judge.

On December 11, 1992, in the midst of trial in this action, the Court denied Victor Levy's motion for reconsideration of exclusion of alibi evidence.[1] At that time, due to time constraints, the Court issued its ruling from the bench, to be followed by written findings.[2] We hereby set forth for the record our findings regarding the preclusion of defendant's alibi evidence.

### LEVY'S ALIBI

Defendant Levy Cordero was not accused in the original indictment. He was first charged in the superseding indictment issued on March 20, 1992 and only in Counts One, Two and Three out of a total of 39 counts. He was charged with conspiracy, importation and possession with intent to distribute approximately 5,000 pounds of marihuana "in March or April of 1987". Defendant was arrested in Miami on June 17, 1992 and brought to this district on July 17, 1992.

Levy's alibi is that he was in Florida from March 19, 1987 through March 28–29, 1987. He listed approximately six witnesses and extensive documentary evidence such as travel agency records, bank card charge records, photographs, arrest records and car purchase records in support of this alibi defense. Alternatively, he argues that the evidence at trial showed that the marihuana load came in prior to March 20, 1987 and

hence, the crimes charged in the indictment are barred by the statute of limitations.

### CASE MANAGEMENT

It is befitting at this time to provide the background of the case so that the reader may better comprehend the factual dimensions of this action. This case involves an intricate multi-defendant, international conspiracy organized to import and distribute narcotics in Puerto Rico and the United States. The case commenced on September 10, 1991, with the filing of an indictment charging 30 counts against 28 defendants.[3] A superseding indictment was subsequently filed on March 20, 1992, charging 39 counts against 39 defendants.[4] Due to the large number of defendants and the volume of motions generated by each of them with respect to discovery, pretrial detention or release as well as numerous other issues, the Court chose to intervene early in the case[5] in an effort to manage it efficiently by streamlining the discovery process, facilitating service and filing of pleadings[6] as well as ensuring the prompt disposition of matters submitted for its consideration. Accordingly, we issued a series of case management, discovery and plea bargaining orders to directly oversee and supervise the development of the case. See, e.g., First Case Management Order, docket No 546, Order in the Matter of Special Requirements for Filings ..., docket No. 547 and Omnibus Order No. 3, In the Matter of Further Discovery and Plea Agreements, docket No. 548, all filed on May 8, 1992. See also Omnibus Orders Nos. 1–8. These management methods proved effective in consolidating the motions filed, avoiding duplicity of pretrial and discovery proceed-

1. See Defendant Victor Levy Cordero's Offer of Proof and Detailed Proffer of Alibi Defense ..., docket No. 1004, filed on December 11, 1992.

2. Defendant also made this issue his main point of contention in his Motion for New Trial, see docket No. 1032, filed on December 28, 1992; Memorandum ... in Support of Order of New Trial ..., docket No. 1155, filed on March 12, 1993 and Reply to Government's Memorandum in Opposition ..., docket No. 1185, filed on April 19, 1993. The Motion for Leave to Reply ... is GRANTED. See also Government's Response to ... Motion for a New Trial, docket No. 1169, filed on April 7, 1993.

3. This case was originally assigned to the docket of the Hon. Gilberto Gierbolini and was transferred to the undersigned's docket on January 8, 1992. See docket No. 316.

4. See docket No. 358.

5. See, e.g., docket Nos. 82 and 208, issued by Judge Gierbolini on September 19 and October 21, 1991, respectively.

6. To date, there are more than 1200 docket entries.

ings and allowing for a speedier resolution of the myriad issues presented.

As part of the pretrial discovery procedures, the Government disclosed its evidence in accordance with the provisions of Rule 16(a) [7], and on August 21, 1992, with the imminence of trial, set for September 9, 1992, it filed a Motion for Discovery Pursuant to Rule 16(b) ..., docket No. 770, seeking reciprocal discovery from the six remaining defendants [8] who, at that time, were expected to go to trial.[9] On September 1, 1992 trial had to be continued sine die due to unforeseen complications.[10]

On September 2, 1992, the Court granted the Government's motion for Rule 16(b) discovery and ordered the five remaining defendants [11] to submit the required reciprocal evidence to the Government no later than September 21, 1992. A Status Conference for October 8, 1992 to discuss trial preparation and availability of counsel for alternative trial dates was also scheduled for October 8, 1992.[12]

At the October 8th Status Conference, the Government again requested reciprocal discovery, claiming that despite the September 21 deadline set by the Court, the only information furnished to date had been the alibi [13] material provided by Forty's counsel in response to the Government's demand therefor pursuant to Rule 12.1.[14] At that time, a lengthy discussion ensued between defense counsel and the Court regarding the feasibility of presenting an alibi defense at trial due to the limitations imposed by the "on or about" time frames alleged in the indictment.[15] This colloquy led defense counsel to move the Court for leave to submit alibis which would, in effect, not be "airtight", due to the indeterminate dates of the charged offenses. In response, the Government moved the Court to require those defendants who intended to avail themselves of an alibi to provide notice therefor within a short period of time so that the Government could adequately prepare itself to respond to the defense at trial. The Court granted this request and ordered that all alibi notices be submitted no later than November 2, 1992. A week later, on October 15, 1992, in Omnibus Order No. 7, the Court reset trial for November 18, 1992,[16] revised its schedule

7. See e.g., Omnibus Order No. 3, docket No. 548 and Government's Consolidated Response to Defendants' Second Master Discovery Motion, docket No. 591, filed on June 9, 1993.

8. By late August, 1992, 28 of the 39 defendants charged in the indictment had pleaded guilty or were in the process of doing so; six remained fugitive; one was under mental evaluation and only six remained for trial, i.e., José S. Forty Estremera, Nelson Mantecón Zayas, William Romero Lewis, Agustín Morales, René Rodríguez Roig and Victor Levy Cordero.

9. The trial date had been programmed since the July 14, 1992, Status Conference and strictly adhered to in an effort to avoid calendar conflicts with counsel participating in another multi-defendant criminal trial pending in this district.

10. The Metropolitan Correctional Center in Miami, where some of the Government's witnesses were detained, was struck by Hurricane Andrew, forcing the evacuation of the prison population to other institutions for an undetermined period of time. Additionally, another multi-defendant case before a fellow judge of this district and which involved several of the same attorneys as this action was put on calendar for trial in September. See Order Continuing Trial Date, Scheduling Status Conference and Setting Deadline for Notice of Alibi, docket No. 787 filed on September 1, 1992.

11. Remaining defendants were Levy Cordero, Forty–Estremera, Mantecón–Zayas, Rodríguez Roig and Romero Lewis. Agustín Morales had by that time filed a motion for change of plea; see docket No. 778, filed on August 27, 1992.

12. See Omnibus Order No. 6, docket No. 789.

13. The Government had formally requested disclosure of alibi information from this defendant on August 21, 1992, because Forty Estremera had made it known to the Government that he intended to present such a defense at trial.

14. See docket No. 769, filed on August 21, 1992.

15. Robert Moore, Esq., counsel for defendant, did not take part in the discussion of this issue. He did, however, state for the record that he had no reciprocal discovery to provide to the Government at that time, but that when he did he would make it immediately available to the Court and the Government. He added that many of the documents he was intending to use would require service of subpoenas.

16. The other multi-defendant trial involving common defense counsel had been rescheduled for January. See supra, note 10.

and again ordered defendants who intended to offer an alibi defense to provide notice thereof, this time no later than October 26, 1992.[17]

In light of Omnibus Order No. 7, defendants Nelson Mantecón Zayas[18], William Romero Lewis and René Rodríguez Roig filed alibi notices on October 14, 28 and 30, respectively.[19] They did so in response to this Court's Order even though the Government had not filed a written demand for alibi disclosure individually as to each of them. The two other remaining defendants, Victor Levy Cordero and Daniel Cruz Torres[20] did not submit notices of alibi.

### TIMING—PRIOR NOTICE

Initially defendant Levy Cordero's counsel argued vehemently that he did not prepare an alibi for March because he was misled by the Government into believing it was April when the alleged offense charged in the indictment was supposed to have taken place. To that effect Mr. Moore stated as follows during the December 9, 1992 proceedings:

> So, based upon the dates that the Government says we had no alibi for the month of April. The accusation in the case is March or April. I don't want to go before a jury, present a defense that he can drive a mack truck through, that has a hole it big enough for the government to drive a mack truck through, so I don't even get into it. I don't even get into it. Don't consider an alibi. And it was never looked into, for the month of April.

We never considered the month an alibi for the month of March, because having an alibi for the month of March, if the month of April is what the government's case is going to prove, is worthless so it was never considered. Never considered. And I relied, absolutely relied, my client relied and I relied to our detriment upon those representations.

December 9, 1992 Trial Transcript pp. 36–37.

> Your Honor, just understand something, for me to come in here with an alibi for the end of March ad present that kind of evidence in this case and to give the Government notice of that kind of evidence, spend resources to put that kind of evidence together in a case where the evidence could show anywhere between March and April is a waste of time, waste of energy and something that I would never do.

December 9, 1992 Trial Transcript pp. 43–44.

> So, my alibi takes me through the end of March. Now, you say end of March, well you know about that. But I never intended in pretrial to put on alibi evidence because I had no way of establishing my client's presence in the month of April, which is when I was told the month occurred.

December 9, 1992 Trial Transcript p. 55.

Despite these assertions, however, counsel was informed by the Government in writing, on no less than two occasions, that the charged marihuana shipment specifically had taken place in late March[21] or "the end of March 1987"[22]. *See* December 9, 1992 Trial

---

**17.** The Order, where pertinent, provided as follows:

> *DEFENDANTS REMAINING FOR TRIAL*
> It appearing that the trial in Cr. No. 90–130 (PG), *United States v. Eusebio Escobar De Jesús,* initially scheduled to begin on October 14, 1992, has been postponed until January, 1993, all parties are advised that the trial of this action is hereby scheduled for Wednesday, November 18, 1992, at 9:00 a.m.
> Accordingly, all those defendants intending to offer an alibi defense shall serve the Rule 12.1(a) Fed.R.Crim.P. Notice of Alibi upon the Government no later than October 26, 1992. The Government's disclosure pursuant to Rule 12.1(b) Fed.R.Crim.P., shall be served upon defendants no later than November 10, 1992. (emphasis in original)

**18.** Defendant Mantecón Zayas subsequently pleaded guilty and did not go to trial.

**19.** *See* docket Nos. 845, 874 and 882.

**20.** Defendant Cruz Torres had been found incompetent to stand trial and had been committed to the Butner Correctional institution in July of 1992 for follow-up treatment. He did not go to trial with the other defendants.

**21.** "No earlier than March 22 ... or March 24, 1987". *See* Government's Consolidated Response to Defendant's Pre-trial Motions at page 3 (docket No. 764, filed on August 19, 1992).

**22.** Government's May 27, 1992 letter to attorney Rafael Anglada (César Castro's attorney) regard-

Transcript p. 46. An attorney with the experience of defense counsel would have undoubtedly ensured before going to trial that a thorough investigation of *all* time periods in March, particularly the end of March, 1987 would have been conducted to eliminate any doubts as to his client's whereabouts during the crucial time period charged in the indictment.[23]

Defendant's counsel argues that it was not *until trial* that it became clear to him that the charged marihuana off-loading operation could not have taken place in April of 1987 as he alleges the Government had indicated but rather, that it took place, according to his calculations, on the weekend before March 20, 1987.[24] Counsel also contends that they were impeded from putting the alibi defense information together prior to the date he announced it (December 7, 1992) because the Government knowingly withheld crucial information regarding the date of the importation of the marihuana load into Puerto Rico and that it wasn't until codefendant Miles Johnson testified[25] that he and his client were able, in a last minute attempt, to assemble the alibi defense. *See* Emergency Motion for Leave to File His Belated Notice of Intention to Introduce Alibi Evidence ..., docket No. 996, filed on December 7, 1992.

Counsel reaches this conclusion after stitching together a series of unrelated facts in an effort to erect what he calls an "unassailable" alibi. In the course of doing so, however, counsel makes several contradictory assertions as to the alleged dates that he and/or Levy discovered that they had an alibi to present. The dates crucial to this issue are: 1) date of Miles Johnson testimony; 2) date defendant allegedly received DUI (driving under the influence) report from Florida State officials; and 3) date of the alleged weekend visit to the State Penitentiary to visit César Castro Gómez.

In the first "emergency motion" for leave to file an alibi (docket No. 996), counsel argues that it was Miles Johnson's testimony as to the date when the co-conspirators took possession of the stash house and the alleged period of time that elapsed before the load arrived that permitted him to pin down the dates for which he could provide an alibi. Miles Johnson testified on November 30 and December 1, 1992.

In his second motion of offer of proof and proffer of alibi evidence, (docket No. 1004) counsel claims that something was said or stated *at trial* that allegedly triggered a recall in the defendant's mind of a red BMW car. This recollection, combined with a subsequent *weekend* visit (during trial) to codefendant César Castro at the State Penitentiary wherein counsel and defendant confirmed Castro's purchase of the car, set off a "chain of events" that culminated with their obtaining a copy of Levy's brother's arrest record for drunk driving on the night of March 23, 1987. According to counsel, it was this "search of the Court Records of Dade County Florida which allowed [them] to determine **conclusively for the first time** that defendant Victor Levy Cordero was in Miami during the relevant time periods in this case in March of '87." (emphasis added). *See* Offer of Proof ... docket No. 1004 at 8 n. 4. Ostensibly, it was this recollection of his

---

ing the date that the marihuana shipment charged in Counts two and three of the indictment allegedly occurred. This letter was part of the discovery that counsel for Levy Cordero received from the Government in July of 1992. *See* docket No. 691, filed on July 14, 1992, Minutes of July 14, 1992 Status Conference, wherein the Court ordered the Government to provide the discovery materials to Mr. Moore no later than July 24, 1992.

23. From the date of Levy's arrest on June 17, 1992 to the commencement of trial on November 18, 1992, defense counsel had five months to research, investigate, and establish his client's whereabouts during the crucial days of March and April of 1987, as charged in the only two

substantive counts (involving only one shipment) that incriminated him in the indictment. Indeed, having been informed in two occasions that the evidence pointed to the end of March, there was no reason for either of them to assume that the Government's evidence at trial would be focused on the April 1987 indictment dates only.

24. The 20th day is crucial because the superseding indictment in this case was returned on March 20, 1992. Crimes charged in the indictment would be barred by the statute of limitations if they occurred prior to March 20, 1987.

25. Miles Johnson testified on November 30, and December 1, 1992.

brother's arrest that led defendant to remember his alleged trip to the NHRA races in March of 1987 thereby placing him out of Puerto Rico at the time of the commission of the offense for which he was charged.

There was, however, something that troubled the Court with respect to these differing versions as to when counsel and defendant allegedly discovered this alibi evidence. For instance:

1. Trial began on Wednesday, November 18, 1992;

2. The first weekend recess allowing for counsel and his client to visit César Castro to confirm the information regarding the red BMW was November 21 and 22, 1992.[26]

3. Miles Johnson testified on November 30 and December 1, 1992. Yet counsel and the defendant had already obtained[27] the DUI arrest record by November 20th, 1992.[28]

This inconsistency in the timing of counsel's "discovery" of an alibi defense caused the Court great consternation, not only as to the trustworthiness and reliability of the alibi, but also about its purpose and significance[29]. Indeed, what most disturbed the Court was the apparent deliberate withholding of this evidence by counsel who, cognizant that he was under a duty to inform the court of this possibility as soon as he began to piece together the alibi evidence and, indeed, could have done so as far back as the beginning of trial, chose instead to ambush the Government and the Court with its disclosure on December 7, 1992, the third week of trial and on the eve of the Government's conclusion of its case in chief.

A good faith gesture by counsel, in compliance with discovery orders and rules, would have alerted the Government in time to be prepared to confront that evidence at trial, keeping the Government from being "sandbagged"[30] and not forcing the Court into having to accept defendant's eleventh hour defense, at face value, without sufficient time to investigate the records, documents and witnesses to be offered by this defendant to confirm their reliability.

It is important to note the considerable number of witnesses, voluminous records and other evidence proffered by defense counsel in support of his client's whereabouts during March 1987. First, this amount of material could not have possibly been gathered overnight which means that counsel and his client remained silent conveniently waiting for the Government to conclude its presentation of evidence while confirming what they already knew was to be the alibi. Good faith required counsel and defendant to at least alert the Court of their investigation and that way avoid the predicament in which they find themselves at this time.

Further, in order to allow the Government an opportunity to investigate the accuracy of the records and adequately prepare to meet the alibi defense the Court would have been forced to provide an extended interruption of the trial. This is due, first of all, to the numerous witnesses and abundant documentary evidence which must be examined and second, to the fact that part of the investigation had to take place outside this jurisdic-

---

**26.** The Government's main witness, Angel Rosa–Collazo began his testimony on November 20 and continued testifying on November 23, 24 and 25, 1992. Mr. Moore extensively cross-examined Angel Rosa–Collazo on November 25, 1992 regarding César Castro's spending habits and inquired specifically as to the latter's purchase of a $70,000.00 red BMW despite the fact that no testimony had been elicited on this particular matter during the direct examination.

**27.** *See* Defendant's ... Offer of Proof.... docket No. 1004 at 9, n. 5. If the certified record was obtained on the 20th, we can assume that it was requested from the Dade County Court on or before said date.

**28.** Even though November 20th was the third day of trial, it was the first day of trial testimony. The other two days involved jury selection, opening statements and arguments regarding motions in limine.

**29.** In particular, the Court had reservations as to how it had been possible for counsel to obtain the DUI report on November 20, 1992, *before* counsel's first "weekend" opportunity to confirm the information which led him to it in the first place.

**30.** Counsel's own description on his purported reliance on the Government's evidence pointing to April instead of March 1987. *See* December 9, 1992 Trial Transcript p. 43.

tion.[31] A continuance would have obviously represented a real risk of mistrial considering this was a well-known case in a relatively small community.[32]

## NOTICE OF ALIBI—RULE 12.1

Rule 12.1 of the Fed.R.Crim.P. provides, inter alia, that upon written demand from the Government, the defendant is to serve a notice of his intention to offer an alibi defense.[33]

▮ Mr. Moore alleges that all defendants except his client were served with a written demand for alibi notice from the Government and that consequently, he was under no obligation to announce his alibi defense as required by the Rule. Contrary to Mr. Moore's contention, however, the Government served a written demand only upon defendant Forty Estremera, and it did so *prior* to the consultation with the Court on this issue at the October 8, 1992 Status Conference. In any event, after our Order requiring early notification of any alibi defense strategy, issued after an extensive discussion with defense counsel in the presence of Mr. Moore, there was no longer any need for the Government to formally present *written* individual demands for alibi disclosure. This point was obviously clear to the Court and remaining parties and is easily substantiated by the fact that three of the four defendants

remaining for trial submitted alibi notices, except Mr. Levy Cordero.[34] Accordingly, Mr. Moore's reasoning that he was not required to notify his intention to use an alibi because of the Government's failure to demand it in writing is inapplicable to the factual situation and irrelevant to the reasoning which compelled this Court's exclusion of defendant's alibi evidence.

## EXCLUSION OF ALIBI EVIDENCE

▮ The courts have outlined through the years several general principles regarding the exclusion of testimony of undisclosed alibi witnesses under Rule 12.1 of the Fed. R.Crim.P. In determining how to exercise its discretionary power to exclude the testimony of undisclosed witnesses under Rule 12.1(d), a district court should consider the amount of prejudice that resulted from the failure to disclose, the reason for nondisclosure, the extent to which the harm caused by nondisclosure was mitigated by subsequent events, the weight of the properly admitted evidence supporting the defendant's guilt, and other relevant factors arising out of the circumstances of the case. *United States v. Myers*, 550 F.2d 1036 (5th Cir.1977). Rule 12.1 clearly empowers the District Court to exclude testimony of alibi witnesses for failure to comply with the rule, under the ratio-

---

31. See December 9, 1992 Trial Transcript p. 49.

32. A continuance would have also interfered with the other multi-defendant case set for January 11, 1993 which was expected to last several weeks and in which counsel for Forty Estremera was scheduled to appear.

33. Where pertinent, Rule 12.1 provides as follows:

(a) **Notice by Defendant.** Upon written demand of the attorney for the government stating the time, date, and place at which the alleged offense was committed, the defendant shall serve within ten days, or at such different time as the court may direct, upon the attorney for the government a written notice of his intention to offer a defense of alibi....

(b) **Disclosure of Information and Witness.** Within ten days thereafter, ... the attorney for the government shall serve upon the defendant or the defendant's attorney a written notice stating the name and addresses of the witnesses upon whom the Government intends to rely to establish *defendant's presence at the scene of the alleged offense and any other witnesses*

to be relied on to rebut testimony of any of the defendant's alibi witnesses.

(c) **Continuing Duty to Disclose.** If prior to or during trial, a party learns of an additional witness whose identity, if known, should have been included in the information furnished under subdivision (a) or (b), the party shall promptly notify the other party or his attorney of the existence and identity of such additional witness.

(d) **Failure to Comply.** Upon the failure of either party to comply with the requirements of this rule, the court may exclude the testimony of any undisclosed witness offered by such party as to the defendant's absence from or presence at, the scene of the alleged offense....

. . . .

34. It is also apparent that defendant's nondisclosure of an alibi induced the Government to rely on its nonexistence. See December 9, 1992 Trial Transcript p. 218. Consequently, there was no need for it to specifically and individually demand from Mr. Levy any information relative to a potential alibi defense.

nale that if the rule is to have any teeth, the trial court must be able to impose sanctions, even such drastic ones as barring alibi witnesses from testifying. Before utilizing the sanction of preclusion, however, the Court must be careful to weigh the interests of the defendant against the public interest of avoiding unwanted surprise and delays at trial. *Taylor v. Illinois,* 484 U.S. 400, 414–15, 108 S.Ct. 646, 655–56, 98 L.Ed.2d 798 (1988); *United States v. Barron,* 575 F.2d 752, 757 (9th Cir.1978).

▇ We think the situation before us closely parallels that of *Taylor v. Illinois,* a case in which the United States Supreme Court considered a state trial judge's refusal to allow a defense witness to testify as a sanction for the defense attorney's failure to identify the witness in response to pretrial discovery requests. In *Taylor,* defense counsel moved to add two new witnesses on the second day of trial and after the prosecution's principal witness had testified. He justified the late announcement of this proposed testimony by explaining that he had experienced difficulty in locating the witnesses. However, at a hearing on the matter, it became evident that the defense attorney had visited one of the witnesses [35] a week earlier; thereupon the trial judge found that the attorney's conduct constituted a willful violation of the applicable discovery rules and denied defendant Taylor an opportunity to bring the witness' testimony before the jury. The Supreme Court upheld the preclusion of the witness in *Taylor. Id.* 484 U.S. at 417–18, 108 S.Ct. at 657. The Supreme Court, in discussing the confines of a defendant's constitutional Sixth Amendment right to compulsory process determined that the right, though fundamental, is not absolute:

> The principle that undergirds the defendant's right to present exculpatory evidence is also the source of essential limitations on the right. The adversary process could not function effectively without adherence to rules of procedure that govern the orderly presentation of facts and arguments....

*Id.* at 410–11, 108 S.Ct. at 654.

> [Thus, while] a trial court may not ignore the fundamental character of the defen-

dant's right to offer the testimony of witnesses in his favor, ... the mere invocation of that right cannot automatically and invariably outweigh countervailing public interests.

*Id.* at 414, 108 S.Ct. at 656. *See also United States v. Alvarez,* 987 F.2d 77, 83 (1st Cir. 1993).

And although it declined to establish a mechanical rule to guide all possible discovery violations, the Court did affirm that, as a general matter, the trial judge must consider: "(1) the integrity of the adversary process, (2) the interest in the fair and efficient administration of justice, and (3) the potential prejudice to the truth-determining function of the trial process." *Chappee v. Vose,* 843 F.2d 25, 29 (1st Cir.1988) (citing *Taylor,* 484 U.S. at 415 n. 19 108 S.Ct. at 656 n. 19). Into this evaluation "the judge should also factor in[ ] ... the nature of the explanation given for the party's failure seasonably to abide by the discovery request, the willfulness *vel non* of the violation, the relative simplicity of compliance, and whether or not some unfair tactical advantage has been sought." *Id.* (citing *Taylor,* 484 U.S. at 413–16 nn. 20–21, 108 S.Ct. at 655–56 nn. 20–21).

Turning now to the case at bar and evaluating it under the light of *Taylor,* there is no doubt that Mr. Moore's failure to announce the alibi defense earlier as had been ordered by the Court and was his continuing duty so to do, was "willful and motivated by a desire to gain a tactical advantage [to] minimize the effectiveness of [the Government's] cross-examination and the ability to adduce rebuttal evidence ...". *Taylor,* 484 U.S. at 415, 108 S.Ct. at 656. Months before trial, from the moment he obtained the discovery package, counsel possessed information from the Government manifesting an "end of March 1987 load". He visited codefendant César Castro to inquire about the latter's purchase of the red BMW on the weekend of November 21–22, 1992. Most notably, he was in possession of the document evidencing his client' brother's arrest record by November 20, the first day of the Government's key witness's testi-

---

**35.** The other witness never materialized.

mony. By his own admissions, these were the central pieces of information leading to his client's "sudden" recollection of the alleged trip to the NHRA races in the spring of 1987. It is clear that as in *Taylor*, defense counsel could have satisfied the applicable discovery rules with ease by notifying the Court and the Government—weeks before he actually did so—of his intention to introduce an alibi defense at trial.

Additionally, as in *Taylor*, the "truth determining function" of the trial process was at risk in the situation before us. As stated in *Williams v. Florida*, 399 U.S. 78, 81, 90 S.Ct. 1893, 1896, 26 L.Ed.2d 446 (1970), "[g]iven the ease with which an alibi can be fabricated" we became suspicious of the large number of documents, evidence and defense witnesses who had not been identified until after the eleventh hour. Furthermore, despite counsel's characterization of his alibi as being "airtight",[36] it appears doubtful that defendant could have convincingly proven his stay in Florida beyond March 23, 1987.[37]

We find that Mr. Moore's failure to disclose his intended alibi defense until the eve of the Government's conclusion of the presentation of its evidence, on the third week of trial and after it had lulled the Government into presuming that it *would not* introduce such a defense was, in our mind, "a deliberate and calculated ploy, prejudicial to the government's litigation stance, and menacing to the very integrity of the adversary process." *Chappee* 843 F.2d at 32.

■ Two additional points merit discussion. The first involves Levy's potential involvement in the noncompliance, and whether or not his counsel's deeds should be visited upon him[38], an issue that has already been examined by *Taylor* and its progeny. As plainly stated by the First Circuit Court of Appeals in *Chappee*,

it has been made clear that lack of complicity between attorney and client ... is of scant significance. *Taylor* instructs that the client's connivance is not a necessary concomitant to employing a preclusive sanction: "... [T]he lawyer has—and must have—full authority to manage the conduct of the trial. The adversary process could not function effectively if every tactical decision required client approval. Moreover, given the protections afforded by the attorney-client privilege and the fact that extreme cases may involve unscrupulous conduct by both the client and the lawyer, it would be highly impracticable to require an investigation into their responsibilities before applying the sanction of preclusion.... Whenever a lawyer makes use of the sword provided by the Compulsory Process Clause, there is some risk that he may wound his own client."

*Chappee v. Vose*, 843 F.2d at 29 (quoting *Taylor v. Illinois*, 484 U.S. at 418, 108 S.Ct. at 657); *see also United States v. Johnson*, 970 F.2d 907, 911 (D.C.Cir.1992) ("*Taylor* expressly holds that exclusion may be applied against a defendant who was not personally involved in his counsel's misconduct.")

■ Secondly, even if we were to assume that counsel's failure to timely disclose his alibi defense, was not "willful", *Taylor* has been interpreted as not establishing such an absolute requirement. Thus, as one circuit recently opined:

We think any requirement of bad faith as an absolute condition to exclusion would be inconsistent with the *Taylor* Court's reference to trial court discretion and its extended discussion of the relevant factors

...

*United States v. Johnson*, 970 F.2d at 911. Other circuits have read *Taylor* as establish-

---

**36.** *See* December 9, 1992 Trial Transcript pp. 42 and 64.

**37.** The only direct piece of evidence referred to by the defendant in his Detailed Proffer ... (docket No. 1004), corroborating his presence in Florida during March of 1987 was a non-refundable round trip ticket from San Juan to Orlando departing on March 19 and returning to San Juan on March 23, 1987.

**38.** It bears mentioning that at Mr. Moore's request, the Court permitted Mr. Levy to reside with counsel in a rented apartment in Isla Verde throughout the duration of the trial and even to travel with him to Miami during week-end recesses because counsel represented to the Court that the continuous assistance of his client was indispensable to the effective preparation of trial. *See* November 19, 1992 Trial Transcript p. 64.

ing a balancing test in which bad faith is one of the relevant factors, albeit a powerful one, to be considered before exclusion. *See e.g.,* *Chappee* 843 F.2d at 29–32; *Eckert v. Tansy,* 936 F.2d 444, 446 (9th Cir.1991).

Applying this balancing test we determined that allowing Levy Cordero to go forward with his alibi defense thereby forcing a continuance of the trial on December 7th, would have signified the loss of significant resources, disrupting an extremely taut trial schedule and risked holding a jury in a relatively well-known criminal trial over an extended period of delay. All, of course, requiring largely new preparation when the case was again set for trial. These consequences are significant in the administration of justice and are to be avoided if at all possible after full consideration of the relevant factors set forth in *Taylor* and *Chappee.*

## CONTINUING DUTY TO DISCLOSE— RULE 16(c)

 Notwithstanding the requirements imposed by Rule 12.1, counsel was under a continuing duty to promptly notify the Government and the Court of the existence on any newly discovered evidence pursuant to Rule 16(c) of the Fed.R.Crim.P.[39] Under Rule 16, the defendant's duty to disclose is not triggered until the Government complies with the defendant's request for documents and tangible objects or examination and tests reports.[40] Once the Government has complied, it can request and is entitled to discover documents and tangible objects in defendant's possession or control that the defendant intends to introduce as evidence in its case in chief at trial. The defendant assumes a continuing duty to disclose any newly discovered information that satisfies the Gov-

ernment's request. Indeed, the Court may sanction the defendant for failure to comply with this duty. *See* Rule 16(d)(2) Fed. R.Crim.P.

In the situation before us, it is evident that information in defense counsel's possession as far back as November 20, 1992, which information allegedly set off the "sudden" recollection of his client's purported trip to the NHRA races in March of 1987, and which counsel sought to belatedly present as part of an alibi defense, fell squarely within the parameters of the reciprocal discovery rule, and as such, its exclusion for failure to promptly notify the Court or the Government of its existence was warranted. *See United States v. King,* 703 F.2d 119, 126 (5th Cir.1983) (exclusion of document supporting alibi defense on basis that defendant failed to provide reciprocal discovery is not abuse of discretion even though government had not made written demand for notice of alibi defense).

## CONCLUSION

After consideration of all the relevant factors, allowing defendant's eleventh hour request to present an alibi defense would have been prejudicial to the Government, deleterious to the integrity of the adversary process and detrimental to the administration of justice.

IT IS SO ORDERED.

---

**39.** Rule 16(c) provides as follows:

(c) **Continuing Duty to Disclose.** If, prior to or during trial, a party discovers additional evidence or material **previously requested or ordered,** which is subject to discovery or inspection under this rule, such party shall promptly notify the other party or that other party's attorney **or the court** of the existence of the additional evidence or material.
(emphasis added)

**40.** In the case before us, two master discovery motions were filed by Lead Counsel in represen-

tation of all defendants. *See* Master Discovery Motions . . . , docket Nos. 226A and 568, filed on November 7, 1991 and May 20, 1992, respectively, after which an inspection of the Government's physical evidence was held on June 6, 1992. *See also* Government's Response to Master Discovery Motions, docket Nos. 263 and 591, filed on December 3, 1991, and June 9, 1992, respectively. Pursuant to Rule 16(b), the Government's request for reciprocal discovery, docket No 770, was filed on August 21, 1992.