**UNITED STATES of America, Appellee,**

v.

**Michael Edward JOHNSON a/k/a James Woods, Carter Woods, Louis Stephens, Appellant.**

No. 91–3137.

United States Court of Appeals, District of Columbia Circuit.

Argued April 7, 1992.

Decided July 31, 1992.

Peter L. Goldman, Washington, D.C., for appellant. Gregory B. English, Alexandria, Va. (appointed by the Court) for appellant.

Robin C. Ashton, Asst. U.S. Atty. with whom Jay B. Stephens, U.S. Atty., John R. Fisher and David S. Eisenberg, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before: SILBERMAN, BUCKLEY and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

Michael Johnson was convicted on three counts of wire fraud in violation of 18 U.S.C. §§ 1343 & 2(a), and three counts of receiving stolen property in violation of 18 U.S.C. §§ 2315 & 2(a). He appeals his conviction, contending that the district court erred when it excluded testimony by two alibi witnesses that he identified only a few days before trial, in violation of Rule 12.-1(a) of the Federal Rules of Criminal Procedure. We hold that the district court had discretion to exclude the alibi witnesses but we remand for an explanation of why exclusion was appropriate here. We reject Johnson's other two arguments.

\*　　\*　　\*　　\*　　\*　　\*

According to the government's evidence, Johnson served as a pick-up man in several "moneygram" wire transfers that were part of a scheme to defraud. In such transfers money can be sent from any authorized moneygram agent and picked up in cash or travellers cheques at any American Express office. The sender goes to the agent and completes a form indicating the recipient's name and address, the amount of money being transferred, and the method of payment. The agent then calls American Express's toll-free number in Colorado, states an identification number (used by American Express to debit the agent's account), and provides the details of the transaction. The American Express representative gives the moneygram agent a reference number, which the recipient must provide to collect the money from American Express at the other end. With large transfers, American Express calls the agent back to confirm the details of the

transaction and verify that an authorized moneygram agent set it up.

The key to the swindlers' success in the present scheme lay in diverting the verification calls. One of them would call a moneygram agent posing as a representative of the telephone company and would persuade the agent to forward all calls to a different number for a limited period. Then he would call American Express in Colorado, claim to be a moneygram agent (using the agent's identification number, typically posted in plain view of customers), and arrange for a wire transfer using false names for sender and recipient.

The government's evidence tended to show that in three transactions Johnson used false names to pick up wire transfers—totalling over $25,000—at American Express offices in New York City on June 29, 1990 and July 2, 1990. Apparently on June 25 and June 29, people posing as C & P telephone company representatives called the Mail Box, a moneygram agent in Washington, D.C., and convinced its personnel to forward incoming calls to a telephone booth in the Willard Hotel in Washington. About a week later, the Mail Box's bank account was debited for three American Express moneygrams that it had no record of initiating. American Express agents on the receiving end of each transaction identified Johnson (in photo arrays and in court) as the person who picked up the transfers. According to these eyewitnesses, he picked up $9200 on June 29 as "James Woods" from the American Express office on Vesey Street and $9000 the same day as "Carter Woods" from the office at 374 Park Avenue; he picked up $7500 on July 2 as "Louis Stephens" from the Park Avenue office.

The government also presented evidence of Johnson's prior involvement in the scheme (giving rise to another claim of error). This included evidence of his arrest in the Western District of Missouri on a charge of committing a fraudulent $1000 moneygram transaction in Kansas City, and his confession of that crime and a similar one in Houston, Texas.

Johnson testified on his own behalf, acknowledging prior participation in such a scheme but claiming that he was in Kansas City when the three charged transactions took place. He said he became involved in the scam after succumbing to pressure from two men he had met in Washington; he denied knowing how the scheme worked and said his job was only to pick up the money after others arranged for its transfer. He admitted having picked up money five times in March and April 1990 before his arrest. He claimed, however, that after his arrest in April he remained in Kansas City until August.

Johnson also offered a quite specific (if incomplete) alibi, claiming that on June 28 he went to the Kansas City courthouse for an appearance in connection with a traffic violation; he looked for his attorney, Carl Bussey, but did not see him there and so went to Bussey's office. While Johnson was there, Bussey's associate suffered an epileptic seizure, and he and Bussey helped him calm down. Bussey supported the claim. He remembered the seizure and connected it with his court appearance that day, saying he had jogged his memory by checking court records indicating he had an appearance on June 28. But he did not recall seeing Johnson again until around July 10 and admitted that he had no idea where Johnson was on June 29 through July 4 (thus spanning the two dates of the alleged pick-ups, June 29 and July 2).

Although a first trial in January 1991 ended in a hung jury, Johnson was convicted in a retrial. The district court sentenced him to 19 months under the sentencing guidelines, to be served consecutively with his Kansas City sentence.

\* \* \* \* \* \*

Johnson's principal argument on appeal is that the district court wrongly excluded the testimony of two other alibi witnesses. Rule 12.1(a) requires defendants offering an alibi defense to notify the government of "the specific place or places at which the defendant claims to have been at the time of the alleged offense and the names and addresses of the witnesses upon whom the defendant intends to rely to establish such

alibi", no more than 10 days after the government has stated the time, date and place that the alleged offense was committed and has requested notice of any alibi defense. Rule 12.1(d) gives the court discretion to exclude testimony as a sanction for violating the requirement.

It is not clear when the government gave the defense the request for Rule 12.1 notice, but defendant's non-compliance is not disputed. Only on the eve of the *second* trial, which began on March 6, 1991, did Johnson indicate the existence of the two new alibi witnesses (in addition to Bussey and himself)—his brother Maurice Johnson and his friend Kevin Bivins. Johnson's attorney, who himself evidently only learned of the witnesses from Johnson on February 19, first mentioned them to the prosecutor in a telephone call on February 25th (despite other phone conversations between those dates). He also apparently sent a letter dated February 19, 1991 to the prosecutor and court, saying he intended to call the new witnesses, but the prosecutor did not receive the letter until March 1, and the copy sent to the court was date-stamped as received February 28. The letter contained the witnesses' names and addresses, but did not specifically identify the place Johnson claimed to have been at the time of the moneygram transactions, as Rule 12.1(a) requires.

Rejecting the defendant's request that the remedy for its Rule 12.1 violation be limited to a continuance, the trial court ordered the proposed witnesses' testimony excluded. The judge noted that Johnson's *attorney* had acted in good faith, but addressed neither the defendant's possible lack of good faith nor any other factors that may have guided his choice.

As the Supreme Court has upheld notice-of-alibi requirements such as Rule 12.1, see *Williams v. Florida*, 399 U.S. 78, 80–86, 90 S.Ct. 1893, 1895–98, 26 L.Ed.2d 446 (1970), Johnson here makes the narrower claim that the sanction of exclusion violated the compulsory process clause of the Sixth Amendment, which guarantees the right of

criminal defendants to present witnesses on their behalf. See, e.g., *Pennsylvania v. Ritchie*, 480 U.S. 39, 56, 107 S.Ct. 989, 1000, 94 L.Ed.2d 40 (1987); *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973). The Supreme Court held in *Taylor v. Illinois*, 484 U.S. 400, 416, 108 S.Ct. 646, 656, 98 L.Ed.2d 798 (1988), that the Sixth Amendment permitted exclusion as a sanction, but only where it was not "unnecessarily harsh". The Court regarded the issue as requiring an exercise of discretion by the trial court. See *id.* at 414–16, 108 S.Ct. at 655–57. On one side the judge was not to "ignore the fundamental character of the defendant's right to offer the testimony of witnesses in his favor." *Id.* at 414, 108 S.Ct. at 655. Against that, however, the Court identified "countervailing public interests." It very strongly noted that delayed disclosure might arise from a purpose to present "fabricated testimony". *Id.* at 413–14, 108 S.Ct. at 655–56. Thus, on the side of exclusion it noted "[t]he integrity of the adversary process, ... the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process". *Id.* at 414–15, 108 S.Ct. at 656. The Court said it was "reasonable to *presume* that there is something suspect about a defense witness who is not identified until after the 11th hour has passed." *Id.* at 414, 108 S.Ct. at 656 (emphasis added). Authorizing the trial court to demand an explanation for the delay, the Court said that if the delay "was willful and motivated by a desire to obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence", exclusion would be "entirely consistent" with the purposes of the compulsory process clause. *Id.* at 415, 108 S.Ct. at 656.

■■■ Johnson argues that exclusion was too drastic a sanction here, because the district court found that his lawyer acted in good faith,[1] and a continuance

---

1. The court said, "I would not want the record to reflect anything other than my total confi-

dence in your good faith in any case in which you appear, and I'm confident that these were

following the close of the prosecution's case would have cured any potential prejudice to the government. Appellant's Brief at 17. Several features of this argument fall short. First, we reject any suggestion that use of exclusion as a sanction requires some sort of "least restrictive alternative" analysis. The Court in *Taylor* expressly upheld the exclusion there "[r]egardless of whether prejudice to the prosecution could have been avoided in this particular case" by a lesser penalty. 484 U.S. at 417, 108 S.Ct. at 656; see also *Michigan v. Lucas,* — U.S. ——, ——, 111 S.Ct. 1743, 1748, 114 L.Ed.2d 205 (1991) (observing that the Court in *Taylor* had "acknowledged that alternative sanctions would be adequate and appropriate in most cases" but had "stated explicitly … that there could be circumstances in which preclusion was justified because a less severe penalty 'would perpetuate rather than limit the prejudice to the State and the harm to the adversary process' ") (quoting *Taylor,* 484 U.S. at 413, 108 S.Ct. at 655). Second, we reject the notion that *counsel*'s behavior, which we will assume to have been exemplary, excuses manipulative conduct by the defendant. *Taylor* expressly holds that exclusion may be applied against a defendant who was not personally involved in his counsel's misconduct, 484 U.S. at 417–18, 108 S.Ct. at 657–58, so surely it must be permissible in the opposite situation, where it is the *defendant* (if anyone) who has acted trickily. Cf. *Eckert v. Tansy,* 936 F.2d 444, 446–47 (9th Cir.1991) (exclusion permitted where defendant deliberately withheld information from his own attorney to avoid giving timely notice of alibi).

■ Third, we do not read *Taylor* as establishing "bad faith" as an absolute condition for exclusion. Defendant relies on *Escalera v. Coombe,* 852 F.2d 45, 48 (2d Cir.1988), in which the Second Circuit appeared to so construe *Taylor,* remanding the case to the district court for a hearing on whether the defense acted in bad faith, and saying that the "absence of a good excuse is not necessarily commensurate with 'willful' conduct". It is far from clear, however, that the Second Circuit itself reads *Taylor* so restrictively. Later, without mentioning *Escalera,* the court upheld exclusion of expert testimony offered without notice in violation of Rule 12.2, characterizing *Taylor* as a decision that "procedural rules for adversary process limit defendant's right to present exculpatory evidence" and emphasizing the inadequacy of the defendant's excuse. *United States v. Cervone,* 907 F.2d 332, 346 (2d Cir.1990). One circuit court decision has assumed a good faith test in addressing a claim that defense counsel was constitutionally inadequate in failing to offer some unnoticed alibi evidence, *Grooms v. Solem,* 923 F.2d 88, 90–91 (8th Cir.1991), while others seem to read *Taylor* as establishing a balancing test in which defense bad faith is a powerful factor. See, e.g., *Eckert v. Tansy,* 936 F.2d at 446; *Chappee v. Vose,* 843 F.2d 25, 29–32 (1st Cir.1988); cf. *Horton v. Zant,* 941 F.2d 1449, 1466–67 (11th Cir.1991) (applying *Taylor* to case involving evidence discovered after trial, stating general balancing test but relying on likelihood that evidence was fabricated).

We think any requirement of bad faith as an absolute condition to exclusion would be inconsistent with the *Taylor* Court's reference to trial court discretion and its extended discussion of the relevant factors. While the Court noted that the trial judge had found that "the discovery violation in this case was both willful and blatant", 484 U.S. at 416, 108 S.Ct. at 657, the opinion certainly did not say such findings were essential. Accordingly, we agree with those circuits that have treated bad faith as an important factor but not a prerequisite to exclusion.

■ Here, the district court did not state the basis for its decision to exclude the new alibi witnesses, and did not articulate any application of the *Taylor* balancing test. See, e.g., 3/6/91 Tr. at 14. Further, it explicitly found that Johnson's *attorney* acted in good faith, but did not assess the conduct of Johnson himself. The record

not conveyed to you by Mr. Johnson until you conveyed them to me and to [government coun-

sel]." 3/6/91 Tr. at 7; see also *id.* at 14 ("I have total confidence in your good faith.").

appears to justify exclusion under *Taylor*. The new witnesses were Johnson's brother and friend, and he had at least five months to produce them—from indictment in October 1990 to the start of the second trial in March 1991. The only explanation offered below was defendant's vague assertion of "difficulty in trying to reach these people", which does not even assert that Johnson was unaware of their evidence, much less explain any delay in his learning of any truthful alibi they might have offered. And Johnson's proposed alternative of a continuance clearly would have disrupted the trial schedule and harmed the government, which had brought in witnesses from all over the country; his second proposal, to delay the trial after the prosecution's case-in-chief to allow it time for investigation, was also burdensome as it would have required holding a jury over during the delay. See *Taylor*, 484 U.S. at 413, 108 S.Ct. at 655 (alternative sanctions may be "adequate and appropriate in most cases, but ... they would be less effective than the preclusion sanction and ... there are instances in which they would perpetuate rather than limit the prejudice to the State and the harm to the adversary process"). We could normally affirm on this record, but as the judge's only factual finding (good faith of counsel) is slightly counter to the decision to exclude, we remand for the district court to exercise its discretion under *Taylor* expressly.

■ In doing so, we reject the government's argument that any error was harmless beyond a reasonable doubt. See *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). Although the American Express agents who identified Johnson said they had specific reasons for recalling him (prior transactions, the large sums), error is always a risk in such identifications, and credible evidence placing Johnson in Kansas City at the key times could seriously draw them in question. We note that the *Taylor* balancing itself involves a judgment as to the likelihood of fabrication, an overlapping issue.

\* \* \* \* \* \*

Johnson next argues that the district court improperly permitted the prosecution to introduce evidence of Johnson's other crimes in its case-in-chief. This evidence consisted of testimony by: (1) a Kansas City police officer, who related Johnson's confession of the Kansas City and Houston wire transfer frauds; (2) Ursula Wojtowicz and Olivia Smith–Waters (the two American Express clerks who saw Johnson pick up the $9200 transfer on June 29), who said they remembered him from a previous $8200 moneygram transaction a few weeks before; and (3) Theresa Liwag, another American Express clerk, who said she also remembered Johnson's picking up that $8200.

Johnson does not deny that this evidence was relevant for legitimate purposes, i.e., other than to show propensity to commit the crime. That apparent concession renders it admissible under Rule 404(b) of the Federal Rules of Evidence, *so long as* it also passes Rule 403, i.e., so long as its legitimate probative value was not "substantially outweighed" by its potential for prejudice. See *Huddleston v. United States*, 485 U.S. 681, 688, 108 S.Ct. 1496, 1500, 99 L.Ed.2d 771 (1988); *United States v. Miller*, 895 F.2d 1431, 1435 (D.C.Cir. 1990). But as defendant most definitely contests the outcome of the Rule 403 balance, we must (despite his Rule 404(b) concession) consider the legitimate bases for admission. We note that we review the trial court's Rule 403 determinations with great deference, reversing only for "grave abuse" of discretion. *United States v. Payne*, 805 F.2d 1062, 1066 (D.C.Cir.1986).

■ The eyewitness evidence of the prior $8200 transaction was highly probative, going directly to the likelihood that the witnesses could have recalled Johnson's appearance. On the prejudice side, Johnson points to nothing special, but makes instead a generic claim of prejudicial effect, citing social science data to the effect that limiting instructions are quite futile. See Roselle L. Wissler & Michael J. Saks, On the Inefficacy of Limiting Instructions—When Jurors Use Prior Conviction Evidence to Decide on Guilt, 9 Law & Hum.Be-

hav. 37 (1985). This does not get defendant very far. Even if the data were persuasive as to the frailties of Rules 404(b)'s and 403's premises, that would hardly justify our disregarding the rules that Congress enacted. At most the data might alter our conception of how to weigh the elements in the balance, raising the weight given to the risk of prejudice. But Wissler & Saks' data do not seem strong enough to necessitate any such re-assessment. In the experiment, 160 adults responded to questions about "paper" trials (i.e., ones where they were simply given summaries of testimony and other evidence). Some subjects were told of a "testifying" defendant's prior convictions, others not. Despite instructions to consider prior convictions solely for the credibility of the defendants, the subjects who were told of the prior records in fact made very similar assessments of credibility *per se* but had a substantially higher conviction rate. Interestingly, convictions of the same crime (or a more severe one) tended to affect outcomes far more than perjury convictions. The authors themselves, however, acknowledge the hazards of transposing this kind of sampling to the deliberations of actual juries, noting especially that in a real trial any prior conviction evidence will constitute a far lower proportion of the total evidence received by the jurors. *Id.* at 46 (citing other authorities on the problems in such extrapolation). Accordingly, we defer to another day the issue of what sort of evidence (if any) should induce a court to re-assess the *way* in which it implements the Rule 403 balance. We note that limiting instructions were given here, as we and other courts have often noted in the past. See, e.g., *United States v. Anderson*, 881 F.2d 1128, 1142 (D.C.Cir.1989). Admission of the eyewitness evidence was clearly no abuse of discretion.

 The testimony regarding the Kansas City and Houston transactions is trickier. One of the purposes the trial court noted in its charge was to show intent. But *if* the defendant was the person who collected the cash on the three occasions charged, it appears inconceivable that he could have done so with innocent intent.

Thus Wigmore argues that prior similar acts should be admissible to show intent only if the raw acts are conceded (e.g., passing counterfeit bills), and dispute has shifted to intent exclusively. 2 Wigmore on Evidence § 304, at 249 (Chadbourne rev. 1979). A difficulty with this is that in the absence of a conditional offer to stipulate intent (conditional on the jury's being convinced of the raw facts), compare *United States v. Manafzadeh*, 592 F.2d 81, 87 (2d Cir.1979), criticized in *United States v. Chaimson*, 760 F.2d 798, 805–06 (7th Cir. 1985), the government has the obligation to prove intent. Despite that obligation, the Second Circuit in *United States v. O'Connor*, 580 F.2d 38, 41 (2d Cir.1978), appears to have rejected similar crimes evidence for intent purposes where intent is only "technically" in dispute, not "really" so. Since it is implausible that a person could have innocently collected large sums of money from moneygram agents under different names in a short time, as a practical matter the government did not need to prove intent independently. Intent thus seems a very weak ground of admission.

Besides intent, the trial court in his charge mentioned possible relevance to show that defendant "had a scheme or plan that included the offenses for which he is now on trial", 3/11/91 Tr. 12, and on brief the government mentions defendant's "knowledge of the wire fraud scheme" and of "how the system works", see Appellee's Brief at 25, 28. Though admission to show "knowledge" in some cases may largely overlap with admission to show intent, see, e.g., 2 David W. Louisell & Christopher B. Mueller, Federal Evidence § 140, at 246 (1985), here it seems to merge with participation in a scheme or plan. Defendant acquired knowledge of the scheme by participating in the scheme, and whatever contribution the evidence makes to the likelihood of guilt seems independent of the characterization.

Wigmore argues that far greater similarity (between prior acts and the charged crime) is needed to justify admission of prior acts to show "design, system, plan or scheme" than to show intent. Under the

design or scheme theory, the evidence "is to show (by probability) a precedent design which in its turn is to evidence (by probability) the doing of the act designed." Wigmore, *supra*, at 249. This, says Wigmore, requires a closer similarity:

The added element, then, must be, not merely a similarity in the results, but *such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.*

*Id.* (emphasis in original). After conceding that the difference between "similarity" and "common features indicating common design" is one of degree, Wigmore insists that "the mere prior occurrence of an act similar in its gross features—i.e., the same doer, and the same sort of act, but not necessarily the same mode of acting nor the same sufferer" may be enough to negative innocent intent, but "where the very act is the object of proof, and is desired to be inferred from a plan or system, the combination of common features that will suggest a common plan as their explanation involves *so much higher a grade of similarity as to constitute a substantially new and distinct test."* *Id.* at 250–51 (emphasis added). Nonetheless, Louisell & Mueller observe that prior bad acts evidence "is often received to prove plan, design, or scheme, and cases disapproving the receipt of such evidence for this purpose are few and far between", Louisell & Mueller, *supra*, at 258–61 (footnotes omitted), citing reams of cases for the former point and a handful for the latter; a perusal of the cases cited fails to suggest any clear pattern.

Here, the essence of the similarity is that in all five events Johnson went to an American Express office, used a false name, identified a false sender, and asked for cash rather than travellers cheques. While these features appear (except for the last element) to be essential components of *any* outsider fraud on the moneygram system, that in itself defines a fairly specialized crime (more so than pickpocketing, for example), directed at a single victim. Compare Wigmore, *supra*, at 251. Similar

crimes have been admitted to show design or scheme even where there was a good deal less similarity, as in *United States v. Walton*, 552 F.2d 1354, 1364–65 (10th Cir. 1977), a prosecution for five stolen checks in which the court of appeals upheld admission of evidence of a prior check drawn on a different account bearing different names for payor and payee. All told, we do not find the "grave abuse" required to set aside the trial judge's discretion.

\* \* \* \* \* \*

Finally, Johnson challenges his sentence. The district court calculated the base offense level at 14, grouping the six counts together pursuant to § 3D1.2(d) of the Sentencing Guidelines. The fraud guideline, U.S.S.G. § 2F1.1, provides for a base offense level of 6; the court added 4 points to reflect the amount involved; 2 for more than minimal planning, U.S.S.G. § 2F1.1(b)(2); and 2 for obstruction of justice based on Johnson's false testimony, U.S.S.G. § 3C1.1. The court treated the Kansas City conviction as a prior offense and calculated Johnson's criminal history score at II, resulting in a guideline range of 18 to 24 months. It then sentenced him to concurrent 19–month terms of imprisonment on each count, to be served consecutively with his 10–month sentence for the Kansas City offense.

■ Johnson challenges two aspects of his sentence. First, he contends that his Kansas City conviction should not have been included in his criminal history score and instead should have been grouped with the counts of his conviction here and included in his base offense level. So used, it would have caused no increase in offense level (because of the small amount of money involved), and, being no longer available for criminal history, would have left Johnson with a criminal history of I and a range of 15 to 21 months rather than 18 to 24. The argument misconstrues the guidelines. For purposes of computing criminal history, "any sentence previously imposed upon adjudication of guilt ... for conduct not part of the instant offense" is treated as a prior sentence. U.S.S.G. § 4A1.2(a)(1).

The fact that Johnson had not yet been sentenced for it when he committed the present crimes does not bar inclusion of the Kansas City offense, for application note 1 to § 4A1.2 provides: "A sentence imposed after the defendant's commencement of the instant offense, but prior to sentencing on the instant offense, is a prior sentence if it was for conduct other than conduct that was part of the instant offense."

■ The Kansas City offense would have to be excluded from Johnson's criminal history, however, if it were "part of the instant offense". See § 4A1.2(a)(1). *United States v. Crosby*, 913 F.2d 313, 314 (6th Cir.1990), suggests that the phrase normally excludes consideration of a crime that is an *element* of the offense charged (outside of special circumstances such as a continuing criminal enterprise under 21 U.S.C. § 848). So construed, the provision would give a defendant protection on sentencing from one of the troubling limitations of the law of double jeopardy—that seemingly identical crimes against two sovereigns are treated as wholly independent crimes. See, e.g., *Abbate v. United States*, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959). By that standard, consideration of the Kansas City offense was all right, as it was plainly not an element of the present crimes. Moreover, assuming that conduct not an element of the crimes charged might nonetheless be "part" of it, the Kansas City offense was separate from them in time and place. We cannot see any reasonable basis for upsetting the district court's decision to treat it as a prior conviction. See *United States v. Beddow*, 957 F.2d 1330, 1338–39 (6th Cir. 1992) (prior sentence for carrying concealed weapon severable from later conviction for money laundering even though defendant carried same weapon to complete money laundering transactions); *United States v. Banashefski*, 928 F.2d 349, 351–53 (10th Cir.1991) (prior state conviction for driving stolen car properly treated as prior sentence in federal prosecution for unlawful possession of firearm found in that car's trunk); *United States v. Garcia*, 909 F.2d 389 (9th Cir.1990) (defendant was arrested for carrying methamphetamine and bundle of counterfeit bills; federal prosecution on counterfeit charges properly included state conviction for methamphetamine possession as prior sentence).

■ It does not change matters that Johnson used the same *modus operandi* in each case. His claim to the contrary is based on a misreading of application note 3 of § 4A1.1, which refers to crimes that are part of the same "common scheme or plan". But application note 3 defines "related cases" for purposes of § 4A1.2(a)(2), which provides that "[p]rior sentences imposed in related cases are to be treated as one sentence for purposes of criminal history", and thus describes the relationship between two or more prior sentences, not the relationship between a prior sentence and the instant offense. See *Beddow*, 957 F.2d at 1337; *United States v. Connor*, 950 F.2d 1267, 1271 (7th Cir.1991); *United States v. Walling*, 936 F.2d 469, 471 (10th Cir.1991); *United States v. Lowe*, 930 F.2d 645, 648 n. 10 (8th Cir.1991); *Banashefski*, 928 F.2d at 353; *Garcia*, 909 F.2d at 392; *United States v. Miller*, 903 F.2d 341, 343 (5th Cir.1990). Of course in any event a shared *modus operandi* would not necessarily make crimes part of a common scheme or plan, see, e.g., *United States v. Rivers*, 929 F.2d 136, 139–41 (4th Cir.1991); we need not consider whether any other characteristics would do so, as application note 3 is inapplicable.

■ Johnson's second claim is that his sentence here should run concurrently with the Kansas City sentence. The district court's decision to impose the sentences consecutively was clearly within its discretion. See 18 U.S.C. § 3584(a) ("if a term of imprisonment is imposed on a defendant who is already subject to an undischarged term of imprisonment, the terms may run concurrently or consecutively ... Multiple terms of imprisonment imposed at different times run consecutively unless the court orders [otherwise]"); U.S.S.G. § 5G1.3, commentary (1990) ("Where the defendant is serving an unexpired term of imprisonment, but did not commit the instant offense while serving that term of imprisonment, the sentence for the instant offense

*may be imposed to run consecutively or concurrently* with the unexpired term of imprisonment.") (emphasis added).

\* \* \* \* \* \*

We remand for a finding on whether the two new alibi witnesses' testimony was excludable under *Taylor v. Illinois,* and affirm the district's court's determinations on the past crimes evidence and Johnson's sentence.

*It is so ordered.*