RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0207p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee*,

    *v.*

YOGESH K. PANCHOLI,

        *Defendant-Appellant*.

> No. 24-1127

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:19-cr-20639-1—Linda V. Parker, District Judge.

Argued: January 30, 2025

Decided and Filed: August 5, 2025

Before: McKEAGUE, GRIFFIN, and LARSEN, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Elizabeth A. Franklin-Best, ELIZABETH FRANKLIN-BEST, P.C., Columbia, South Carolina, for Appellant. Joshua K. Handell, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Elizabeth A. Franklin-Best, ELIZABETH FRANKLIN-BEST, P.C., Columbia, South Carolina, for Appellant. Joshua K. Handell, Jeremy R. Sanders, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

─────────────────

## OPINION

─────────────────

LARSEN, Circuit Judge. Yogesh Pancholi defrauded Medicare of millions of dollars, pocketed the money, and transferred it offshore to India, where it remains unrecovered. He was tried and convicted of health care fraud, witness tampering, money laundering, and aggravated

identity theft.  He appeals, arguing that his Fifth and Sixth Amendment rights were violated at trial.  Because they were not, we AFFIRM.

I.

In 2017, Pancholi was a defendant in a civil suit under the False Claims Act, accused of paying kickbacks to doctors who referred patients to healthcare entities affiliated with his employer.  To settle that suit, Pancholi agreed to a five-year voluntary exclusion from Medicare and Medicaid programs.  But about a year later, Pancholi purchased Shring Home Health Care, Inc., a participating Medicare provider, using an alias and forged corporate ownership documents.

Shring then began submitting hundreds of Requests for Advance Payment (RAPs) to Medicare, asserting that it was providing home-healthcare services.  Between November and December 2018, Shring submitted approximately 900 RAPs, totaling more than $2.7 million.  But the claims were fraudulent:  Shring wasn't providing the healthcare services it claimed to be.  Pancholi pocketed the payments for the fake services, which he transferred to India.  Much of the stolen proceeds remain unrecovered.

In 2019, a grand jury indicted Pancholi for health care fraud, money laundering, and conspiracy to commit health care and wire fraud.  His trial was delayed until 2022.  A month before trial was to begin, Sai Pagudala, a former Shring employee, who was set to testify against Pancholi, traveled to India.  Using the name "Khuram Baig," Pancholi sent multiple emails to the U.S. Departments of State and Homeland Security falsely alleging that Pagudala had committed visa and immigration fraud.  These reports led the State Department to deny Pagudala's visa renewal application.  After Pancholi's deception was uncovered, the grand jury returned a superseding indictment, adding counts of aggravated identity theft and witness tampering.  Pancholi pleaded not guilty, and the case proceeded to trial in 2023.

Pancholi's appeal centers on two incidents during trial.  In the first, the district judge denied a motion to withdraw made by Pancholi's counsel and excluded Pancholi from an in-chambers conference.  In the second, the trial court denied Pancholi's request to present the

testimony of an unindicted co-conspirator who turned up as a surprise witness on the last day of trial.

*The first incident*. Towards the end of the government's case, one of Pancholi's two attorneys, Anjali Prasad, approached Assistant U.S. Attorney Shankar Ramamurthy during a recess and commented on the incompetency of her co-counsel, Robert Harrison. Ramamurthy brought Prasad's comment to the court's attention, which led to a lengthy exchange. During that exchange: Prasad confirmed Ramamurthy's account; Harrison offered to withdraw if Pancholi were dissatisfied with his services; the court asked Pancholi whether he was satisfied with Harrison; Pancholi expressed concern about Harrison's health, as he'd been battling a chest cold over the past several days; and Pancholi broached the idea of briefly delaying trial to allow Harrison time to recover.

The next morning, Prasad moved to withdraw as counsel. She stated that her comments the previous day had "resulted in the complete deterioration of relationships with the individuals at this table" and that her services had been "rendered useless and ineffective." R. 101, Trial Tr., PageID 1448. The court immediately denied Prasad's motion. Harrison then moved for a mistrial conditional on the court granting Prasad's motion to withdraw, but the court explained that it had "already denied" Prasad's motion. *Id.* at 1449.

The court then engaged in an extended colloquy with the parties. The court asked Harrison if he felt he could continue working with Prasad; Harrison said he felt no personal animus towards Prasad. Harrison again expressed concern about his ability to continue in the case, given Pancholi's earlier statements regarding Harrison's ill health. The court then heard from Pancholi, who revealed that Harrison and Prasad had argued the previous night, during which both attorneys said they would not conduct any further cross-examination. The court interrupted Pancholi, explaining that he was revealing privileged communications. Pancholi then said, "I cannot have an attorney who wants to withdraw [from] the case. I don't know how effective it's going [to] be." *Id.* at 1453. The court then ordered an hour's recess to give Pancholi and his lawyers time "to get in a room together and work this out." *Id.*

After the recess, Harrison requested further discussion with the court at an on-the-record, in-chambers conference.  The court agreed, stating that "Mr. Pancholi is not coming in."  *Id.* at 1457.  Harrison responded, "[t]hat's all right."  *Id.*  At the in-chambers conference, Harrison expressed his desire for a continuance to give him time to recover from his cold.  He reiterated his belief that "there's been a complete breakdown between the attorney/client privilege" and that Pancholi "has no confidence in our continuing to represent him."  R. 131, In-Chambers Conf. Tr., PageID 2236–37.  Prasad stated that Pancholi "has indicated to me that I kind of created a mess of things and there's no confidence that I can continue in this case."  *Id.* at 2235–36.  The court again denied Prasad's motion to withdraw, *id.* at 2236, indicating that it had seen "nothing but competency" from Harrison and Prasad, *id.* at 2239.  The parties then discussed scheduling and the possibility of postponing the trial for several days to give Harrison time to recover.  The court decided to adjourn trial for several days until the following Monday.  Both Prasad and Harrison continued to represent Pancholi for the remainder of trial.

*The second incident*.  On the last day of trial, Pancholi's counsel alerted the court to a surprise witness:  Leena Shah, Pancholi's unindicted co-conspirator.  Shah had apparently turned up at trial out of the blue, ready to testify for Pancholi.  Defense counsel informed the court that they had not previously spoken with Shah "because [they] believe[d] she had counsel," but it turned out that Shah had fired her attorney.  R. 103, Trial Tr., PageID 1691.  Prasad informed the court that she'd been advised that Shah was "favorable" to Pancholi, but she needed time to evaluate whether to call Shah as a witness.  *Id.*  She admitted that she didn't know how Shah's Fifth Amendment right against self-incrimination would affect the possibility of her testifying.

The court gave Pancholi's counsel time to speak with Shah, after which defense counsel indicated that they in fact wished to call her.  Prasad stated that Shah would serve as an "exculpatory" witness, *id.* at 1701, but offered no detail as to how Shah's potential testimony would exculpate Pancholi.  The government objected, noting that Pancholi had not included Shah on his witness list.  The court asked Ramamurthy whether the government would be prejudiced by Shah testifying.  Ramamurthy explained that Shah's testimony would cause significant delay, and he expressed "serious concern" that, even after that delay, Shah, "the subject of an ongoing investigation," would ultimately refuse to testify after seeing the

"overwhelming" evidence that the government would bring to bear on cross-examination. *Id.* at 1702–03.

After a quick recess, the district court decided to exclude Shah as a potential witness. First, the court found that Pancholi had violated a discovery order by failing to provide advance notice of his intent to call Shah.[1] Next, the court explained that, on its reading of the caselaw, the Compulsory Process Clause of the Sixth Amendment grants a defendant the right to present witnesses but "does not create an absolute bar to" precluding defense witness testimony "as a sanction for violating a [discovery] rule." *Id.* at 1705. The court cited *Taylor v. Illinois*, 484 U.S. 400 (1988), and explained that, in deciding whether to allow Shah to testify, it was "balancing" Pancholi's right to offer testimony in his favor against countervailing considerations. R. 103, Trial Tr., PageID 1706.

The court then explained its rationale for excluding Shah's potential testimony:

> Here Mr. Pancholi has been aware of Leena Shah and could have prepared to call her as a witness well before the last day of this almost two-week trial. In addition to the government's interest in protecting itself against an 11th hour defense, we have the interest of an efficient administration of justice here and that is definitely being compromised in this Court's view.
>
> We also have the interest of the jury who has been sitting patiently through these proceedings. They have been prolonged unnecessarily. I'm going to add in part due to other issues that have been raised by the defense, and to a certain extent created by the defense. More significantly, we have a witness who, based on the evidence that's been presented, appears to be a co-conspirator. In fact, the government has indicated that she is an uncharged co-conspirator.
>
> Mr. Ramamurthy just said that this is an ongoing investigation. Therefore, she is likely, in the Court's view, to invoke her Fifth Amendment right against self-incrimination. For these reasons, I am not going to allow the defense to call Leena Shah as a witness.

*Id.* at 1706–07.

---

[1]The court cited Federal Rule of Criminal Procedure 16 as authority for the exclusion. That rule requires parties to disclose *expert* witnesses in advance of trial. *See* Fed. R. Crim. P. 16(b)(1)(C). The court's invocation of Rule 16 was not quite apt since the rule does not require defendants to disclose *lay* witnesses, and there is no indication that Shah would have testified as an expert. *See id.*; *United States v. Russell*, 109 F.3d 1503, 1510 (10th Cir. 1997) (White, J.). That said, courts have recognized district courts' authority to order parties to produce witness lists prior to trial. *Russell*, 109 F.3d at 1510.; *cf. United States v. Kendricks*, 623 F.2d 1165, 1168 (6th Cir. 1980) (per curiam). The district court did so here, and the parties do not take issue with that order.

After the district court excluded Shah's testimony, the defense rested, and the parties offered their closing statements. The jury convicted Pancholi on all counts, and the court sentenced him to 108 months' imprisonment.

## II.

Pancholi raises three arguments on appeal. We address each in turn.

## A.

Pancholi first argues that the district court violated his Sixth Amendment right to compulsory process by preventing Shah from testifying. We disagree.

## 1.

The Constitution guarantees a criminal defendant "a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citation omitted). The Supreme Court has "rooted" this right in both the Due Process Clause and the Compulsory Process Clause. *Id.* With respect to compulsory process, the Court has explained that a defendant's "right . . . to have compulsory process for obtaining witnesses in his favor," U.S. Const. amend. VI, includes both the right to compel witnesses' *attendance* and the "right to present" their testimony "to establish a defense." *Washington v. Texas*, 388 U.S. 14, 19 (1967). The Court has deemed the accused's right "to present witnesses in his own defense" "fundamental" and "an essential attribute of the adversary system itself." *Taylor*, 484 U.S. at 408.

But the right has limits. The Sixth Amendment does not grant the accused "an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Id.* at 410. Those rules (and their application) pose no constitutional problem so long as they are neither "arbitrary" nor "disproportionate to the purposes they are designed to serve." *Rock v. Arkansas*, 483 U.S. 44, 56 (1987). "[E]stablished rules of procedure" likewise curtail an accused's right to present defense evidence. *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973); *see also Taylor*, 484 U.S. at 410–11.

In *Taylor*, the Supreme Court held that a trial court may exclude a defense witness as sanction for a discovery violation.  484 U.S. at 402.  Ray Taylor was charged with attempted murder.  *Id.*  After the prosecution's principal witnesses had testified, Taylor's defense counsel sought to call Alfred Wormley as a witness, though defense counsel had omitted Wormley from its witness list.  *Id.* at 403.  The trial court found that the omission was a "blatant[]" and "willful" discovery violation and thus barred Wormley from testifying.  *Id.* at 405.  On appeal, Taylor argued that excluding Wormley's testimony violated his compulsory-process rights.  *Id.* at 406.

The Supreme Court disagreed.  The Court rejected Taylor's "extreme" position that the Compulsory Process Clause "creates an absolute bar to the preclusion of" defense witness testimony as a discovery sanction, leaving the appropriate sanction instead to the trial court's discretion.  *Id.* at 410, 414.  The Court declined to adopt "a comprehensive set of standards to guide the exercise of discretion in every possible case."  *Id.* at 414.  Instead, the Court offered some general guidance:

> It is elementary, of course, that a trial court may not ignore the fundamental character of the defendant's right to offer the testimony of witnesses in his favor. But the mere invocation of that right cannot automatically and invariably outweigh countervailing public interests.  The integrity of the adversary process, which depends both on the presentation of reliable evidence and the rejection of unreliable evidence, the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process must also weigh in the balance.

*Id.* at 414–15.  The Court further "presume[d] that there is something suspect about a defense witness who is not identified until after the 11th hour has passed" and noted that the ease of complying with the discovery rule is a relevant consideration.  *Id.*

The Court then upheld the exclusion of Wormley's testimony.  Noting the trial court's finding that the discovery violation was "both willful and blatant," the Court deemed "the inference that [Taylor] was deliberately seeking a tactical advantage . . . inescapable."  *Id.* at 416–17.  And the Court found it "plain that the case fits into the category of willful misconduct in which the severest sanction is appropriate."  *Id.* at 417.

After *Taylor*, a few things are relatively clear.  First, there's little doubt that a "willful" discovery violation "motivated by a desire to obtain a tactical advantage," *id.* at 415, will

generally justify exclusion.  On the other hand, a discovery violation will not *always* justify preclusion.  *Michigan v. Lucas*, 500 U.S. 145, 152 (1991).  And before resorting to the exclusion sanction, trial courts should consider whether a "less severe sanction" would suffice.  *Ferensic v. Birkett*, 501 F.3d 469, 478 (6th Cir. 2007).

Beyond that, the doctrine's contours are less discernible.  *See* 4 Wayne R. LaFave, Jerold H. Israel & Nancy J. King, Criminal Procedure 945 (2d ed. 1999) (characterizing *Taylor* as "arguably rais[ing] as many questions as it answers").  Most relevant here, courts are divided on whether *Taylor* makes a "willful" discovery violation a prerequisite to a lawful exclusion.  *Tyson v. Trigg*, 50 F.3d 436, 445 (7th Cir. 1995) (Posner, J.) (noting a circuit split).  Some courts have read *Taylor* as establishing a bad-faith requirement.  *See Noble v. Kelly*, 246 F.3d 93, 99–101 (2d Cir. 2001) (per curiam); *United States v. Peters*, 937 F.2d 1422, 1426 (9th Cir. 1991); *Darghty v. State*, 530 So.2d 27, 32 (Miss. 1988).  But others have rejected that reading, deeming bad faith "an important factor but not a prerequisite to exclusion."  *United States v. Johnson*, 970 F.2d 907, 911 (D.C. Cir. 1992) (Williams, J.); *see also Young v. Workman*, 383 F.3d 1233, 1239 (10th Cir. 2004) ("[A] finding [of willfulness] is not required for exclusion to be justified as a sanction for discovery violations."); *People v. Pronovost*, 773 P.2d 555, 558–59 (Colo. 1989).

The courts that have not required willfulness have the stronger of the argument.  First, *Taylor* did not hold that willfulness is required in every case.  The violation in *Taylor* was both willful and made to obtain a tactical advantage, and the Court held that exclusion was "appropriate" in those circumstances.  484 U.S. at 417.  But the Court had no need to establish the constitutional parameters governing exclusion as a sanction for *non-willful* discovery violations, and nothing in the opinion purports to do so.  *Johnson*, 970 F.2d at 911.  In fact, the Court explicitly disclaimed any "attempt to draft a comprehensive set of standards to guide the exercise of discretion in every possible case."  *Taylor*, 484 U.S. at 414; *see also Young*, 383 F.3d at 1239.  Instead, the Court emphasized the trial court's discretion and engaged in an "extended discussion of the relevant factors" for courts to consider.  *Johnson*, 970 F.2d at 911; *see Taylor*, 484 U.S. at 414–16.  That line of reasoning seems "inconsistent" with requiring "bad faith as an absolute condition to exclusion."  *Johnson*, 970 F.2d at 911.

Our precedent interpreting and applying *Taylor* offers further support for treating the defendant's behavior as "an important factor but not a prerequisite." *Id.* We have addressed *Taylor* on several occasions in published caselaw.

First, *United States v. Hamilton*, 128 F.3d 996 (6th Cir. 1997). There, Hamilton was charged with filing false income tax returns. *Id.* at 998. The government's theory was that Hamilton had cashed numerous checks from coal-sale proceeds, which were personal income that Hamilton failed to report. *Id.* On the sixth day of trial, Hamilton moved to introduce cash receipts to show that he'd used the proceeds to purchase coal for a coal company's account. *Id.* The trial court excluded the receipts because they had not been produced before trial, in conformity with a discovery order. *Id.* at 999. Hamilton argued that excluding the receipts violated his compulsory-process rights. Describing *Taylor* as a "balancing test," we rejected that claim. *Id.* at 1004. Specifically, we reasoned that the record supported a finding that Hamilton's discovery violation was willful and made to obtain a tactical advantage at trial; the violation prejudiced the government's case; and the defendant could have easily complied with the discovery rule. *Id.* at 1003–04. Those "efficiency and fairness concerns," were sufficient to "outweigh [the] defendant's right to compulsory process." *Id.* at 1004.

We next addressed *Taylor* in *Ferensic*, 501 F.3d at 474–80. On habeas review, we considered whether a Michigan court's exclusion of a defendant's expert witness ran afoul of *Taylor*. Ferensic, on trial for armed robbery and home invasion based on eyewitness identifications made by the victims, wanted to present the testimony of Dr. Shulman, an expert on eyewitness identifications. *Id.* at 470. But Ferensic violated a discovery rule by mailing a copy of Shulman's report to the prosecution only eleven days before trial, rather than the required two months. *Id.* at 471. So the Michigan court did not let Shulman testify. *Id.*

We held that the state appellate court's decision upholding the exclusion of Shulman's testimony was unreasonable. *Id.* at 480. The panel noted that Ferensic's violation was not willful or made to obtain a tactical advantage because defense counsel had turned over Shulman's report as soon as he received it. *Id.* at 478. Further, we reasoned that Ferensic's misstep caused no delay and did not prejudice the prosecution. *Id.* Moreover, we characterized Ferensic's interest in Shulman's testimony as "weighty," given how often eyewitness

misidentifications result in false convictions. *Id.* We concluded that a less severe sanction "was appropriate" or at least "should have been considered." *Id.*

Third, *United States v. Hardy*, 586 F.3d 1040 (6th Cir. 2009). There, Hardy was charged with bank fraud and tax evasion. *Id.* at 1041. The government's theory was that Hardy had embezzled money from her employer. *Id.* Hardy claimed instead that she had lent her employer money and had then made "repayments" to herself by transferring funds from her employer's account. *Id.* at 1042. She sought to introduce copies of check stubs showing that a loan existed, but the district court excluded the stubs because Hardy had not disclosed them in accordance with Federal Rule of Criminal Procedure 16(c). *Id.* Hardy appealed on compulsory-process grounds, but we upheld the exclusion. *Id.* at 1043. We reasoned that the "(1) the integrity of the adversary process; (2) the interest in the fair and efficient administration of justice; and (3) the potential prejudice to the truth-determining function of the trial process" all weighed in favor of excluding the stubs. *Id.* at 1045 (citation omitted). We also noted that the defendant's discovery violation may have been motivated by desire to gain an unfair advantage at trial. *Id.*

None of our cases applying *Taylor* has held that a finding of willfulness is essential to witness exclusion as a discovery sanction. Although several of our cases concluded that the defendant's behavior was, or might have been, willful or tactical, no case held that willfulness is a prerequisite to exclusion. Rather, each case considered that conduct, along with the other factors set forth in *Taylor*, and balanced the sum against the defendant's interest in presenting the excluded evidence. For instance, although *Hamilton* addressed a willful violation, our description of *Taylor* treated willfulness as an important factor rather than a prerequisite. We described *Taylor* as requiring a "balancing test," and we observed that courts "must consider" not only "the willfulness of the violation," but also the party's explanation for the violation, and the ease of compliance with the court's orders. *Hamilton*, 128 F.3d at 1001–02. The panel in *Ferensic* also treated willfulness as a relevant factor rather than a precondition. To be sure, we reiterated *Taylor*'s instruction that a sanction less severe than exclusion will often be "adequate and appropriate" and stated that "only egregious violations involving, for example, 'willful misconduct'" will justify exclusion. *Ferensic*, 501 F.3d at 476 (citation omitted). But in application, we did not treat Ferensic's lack of willfulness as dispositive. Rather, we also took

note of other factors deemed relevant in *Taylor*—"the absence of harm to the prosecution" and "lack of any delay caused by counsel's misstep." *Id.* at 478; *see Taylor*, 484 U.S. at 415–17.

Reading willfulness as a relevant factor rather than a prerequisite to exclusion likewise tracks our unpublished caselaw. First, in *Johnson v. Wolfe*, on habeas review, we upheld an Ohio trial court's exclusion of a rebuttal witness as sanction for failure to comply with a state discovery rule. *See* 44 F. App'x 702, 715–16 (6th Cir. 2002). Even though the excluded testimony was "highly important for [Johnson's] defense," we held that the exclusion was not contrary to *Taylor* without even discussing whether the discovery violation was willful. *Id.* at 715. Second, in *Williams v. Curtin*, we upheld a Michigan trial court's exclusion of a defense witness's testimony as sanction for failure to timely provide written notice of intent to present an alibi witness. *See* 613 F. App'x 461, 462 (6th Cir. 2015). We acknowledged that the trial court had not found the violation "willful or deliberately designed to gain unfair tactical advantage." *Id.* at 467. Nevertheless, we held that the Michigan court's exclusion was not contrary to *Taylor*. *Id.* at 468.

In sum, we do not read *Taylor*—or our caselaw applying it—to require a finding of willfulness before a trial court may impose the sanction of preclusion.

2.

Here, the district court excluded Shah's potential testimony as a sanction for a discovery violation. Under the circumstances, that exclusion did not violate Pancholi's right to present witnesses in his own defense. Rather, the district court reasonably applied the balancing test set forth in *Taylor*.

First, Pancholi easily could have complied with the discovery order by including Shah's name on the witness list. *See Taylor*, 484 U.S. at 415. Shah was Pancholi's unindicted co-conspirator, so Pancholi and his attorneys knew of Shah well in advance of trial. *Taylor* noted that the "burden" of identifying potential witnesses "adds little" to the "routine demands of trial preparation." *Id.* at 416. That's all the more true when the defendant knows of the witness well in advance of any discovery deadline. And while it was not clear whether Shah would

ultimately testify given self-incrimination concerns, those concerns posed no obstacle to initially listing Shah and later deciding not to call her.

Second, allowing Shah to testify would have caused further delay. "Delay in a jury trial is a serious matter . . . ." *Hamilton*, 128 F.3d at 1004 (quoting *Tyson*, 50 F.3d at 446). At the very least, Shah—who had fired her attorney—would have needed new counsel to advise her of the ramifications of testifying. That would have taken time. Shah's new counsel then would have needed to review what the prosecution described as an "overwhelming amount" of evidence demonstrating Shah's involvement in the underlying conspiracy. R. 103, Trial Tr., PageID 1703. That too would have caused significant delay, which the trial court was entitled to consider. *See Taylor*, 484 U.S. at 415 (stating that the trial court may consider the "efficient administration of justice"); *see also Hamilton*, 128 F.3d at 1004 ("[A]llowing the surprise admission of the receipts would have delayed the trial . . . ."); *Russell*, 109 F.3d at 1511 ("[I]ntegrity and scheduling considerations alone may justify suppression of otherwise admissible evidence offered by the delinquent party."); *United States v. Sparkman*, 500 F.3d 678, 682 (8th Cir. 2007) ("[W]e would not lightly conclude that the court was required to continue a trial due to a timing problem that was largely of the defendant's own making.").

Third, Pancholi did not present Shah until she suddenly appeared in the courtroom on the last day of a two-week trial. As the Court said in *Taylor*, it is "reasonable to presume that there is something suspect about a defense witness who is not identified until after the 11th hour has passed." 484 U.S. at 414; *see also Hamilton*, 128 F.3d at 1002. We see no reason why that assumption ought not apply here.

Fourth, allowing Shah to testify may have prejudiced the government. As the Court noted in *Taylor*, the government has an interest "in protecting itself against an eleventh-hour defense." 484 U.S. at 412. And while the government was certainly aware of Shah, we are mindful that "the prosecution's ability to rebut the surprise evidence effectively is usually less than its ability during the case in chief." *Hamilton*, 128 F.3d at 1004 (cleaned up) (quoting *Tyson*, 50 F.3d at 446); *cf. United States v. Barron*, 575 F.2d 752, 758 (9th Cir. 1978) ("[E]ven when the government knows the identity of defense witnesses, the government may still be surprised to learn that they intend to testify about an alibi.").

Finally, and perhaps most importantly, we have no way of gauging how significant Shah's excluded testimony would have been to Pancholi's defense because Pancholi has not told the court what her testimony would have contained. To be sure, *Taylor* does not plainly state whether or how reviewing courts should consider the relative importance of the excluded evidence to the defense. But *Taylor* explained that "the mere invocation of th[e] right" to compulsory process does not entitle the defendant to relief. 484 U.S. at 414. Instead, courts are to "weigh" the "defendant's right to offer the testimony of witnesses in his favor" against "countervailing public interests." *Id.* at 414–15. That task necessarily requires a court to consider the character and importance of the excluded evidence to the defense.**[2]**

Both this court and others have considered the importance of the excluded evidence when deciding claims under *Taylor*. For instance, in *Ferensic*, we weighed the defendant's inability "to present two *critical* witnesses" against the court's "legitimate[] 'need to manage its trial docket,'" the "absence of harm to the prosecution," Ferensic's "lack of willfulness," and the "lack of any delay." 501 F.3d at 478 (emphasis added); *see also id.* (describing Ferensic's interest in the excluded testimony as "weighty" in light of its importance to the issues in the trial (citation omitted)). Other courts have likewise considered the importance of the excluded evidence. *See Tyson*, 50 F.3d at 446 ("[O]ne highly relevant circumstance is the importance of the excluded witness to the defense."); *United States v. Bahamonde*, 445 F.3d 1225, 1231 (9th Cir. 2006) ("The most significant consideration is how important was the witness?" (citation and internal quotation marks omitted)); *Richmond v. Embry*, 122 F.3d 866, 874 (10th Cir. 1997) (considering the fact that the excluded testimony was "at best, only marginally relevant"); *Short v. Sirmons*, 472 F.3d 1177, 1189 (10th Cir. 2006).

Here, we cannot say how important the excluded evidence was to Pancholi's defense for the simple reason that we have no idea what Shah planned to say on the stand. Pancholi

---

**[2]**What's more, *Taylor* directs courts to consider both "the potential prejudice to the truth-determining function of the trial process" and "[t]he integrity of the adversary process." 484 U.S. at 414–15. Those factors can sensibly be read to encompass the importance of the excluded testimony. After all, the more central the excluded testimony to a defendant's case, the greater the risk that exclusion will prejudice a court's ability to truthfully ascertain a defendant's guilt. False determinations of guilt and innocence, in turn, denigrate the integrity of the adversary process. And the more important the testimony, the more "drastic" the exclusion sanction will be. *Id.* at 413. The converse is also true.

provided no factual detail regarding Shah's testimony.  So we don't know *whether*, *how*, or *how much* Shah's testimony would have exculpated Pancholi, *which charge(s)* Shah's testimony would have been relevant to, or even whether the testimony would have been admissible under the Rules of Evidence.  As Pancholi himself admits, he "is unable to articulate what exculpatory evidence" Shah would have revealed.  Appellant Br. at 18.

That dooms Pancholi's claim.  The Supreme Court has held that "more than the mere absence of testimony is necessary to establish a violation of the right" to compulsory process. *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982) (citing *Washington*, 388 U.S. at 14).  So Pancholi "can establish no Sixth Amendment violation without making some plausible explanation of the assistance he would have received from [Shah's] testimony."  *Id.* at 871.[3] Pancholi has made no such showing here.  Thus the trial court did not commit constitutional error by precluding Shah from testifying.

B.

Next, Pancholi argues that the district court abused its discretion by denying Prasad's motion to withdraw.  It did not.

The Sixth Amendment grants non-indigent defendants the right to choose their own counsel. *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006).  Violation of that right is structural error. *Id.* at 150.  But this right also has limits. *See Wheat v. United States*, 486 U.S. 153, 159 (1988).  Trial courts have "wide latitude" to balance the right to choice of counsel against "the needs of fairness" and "the demands of [their] calendar[s]." *Gonzalez-Lopez*, 548 U.S. at 152.

A defendant's motion to substitute counsel implicates his right to choose his own attorney. *See Wheat*, 486 U.S. at 157–58, 163–64.  We review the denial of such a motion for abuse of discretion. *See United States v. Trevino*, 7 F.4th 414, 428 (6th Cir. 2021).  In doing so, we generally consider four factors:

---

[3]The Federal Rules of Evidence require a similar showing.  *See* Fed. R. Evid. 103(a)(2) ("A party may claim error in a ruling to . . . exclude evidence only if the error affects a substantial right of the party and . . . a party informs the court of its substance by an offer of proof, unless the substance was apparent from the context.").

> (1) the timeliness of the motion, (2) the adequacy of the court's inquiry into the matter, (3) the extent of the conflict between the attorney and client and whether it was so great that it resulted in a total lack of communication preventing an adequate defense, and (4) the balancing of these factors with the public's interest in the prompt and efficient administration of justice.

*United States v. Mack*, 258 F.3d 548, 556 (6th Cir. 2001).

The court did not abuse its discretion in denying Prasad's motion to withdraw.

First, the district court conducted an adequate inquiry. Between open-court and in-chambers conversations, the district court let Prasad, Harrison, and Pancholi thoroughly explain their views on the attorney-client relationship. That inquiry was sufficient under our caselaw. *See United States v. Chambers*, 441 F.3d 438, 447 (6th Cir. 2006); *see also United States v. Henderson*, 626 F.3d 326, 340 (6th Cir. 2010).

Second, the record does not reflect a "complete breakdown in communication" between Pancholi and his attorneys. *United States v. Vasquez*, 560 F.3d 461, 468 (6th Cir. 2009). A "strained" relationship is not enough. *Id.* And Pancholi has not identified any period during which he could not meaningfully consult with his counsel.

Third, allowing Prasad to withdraw may have caused further delay. If Prasad had withdrawn, Pancholi would have been left with just Harrison. At the time, Harrison was both sick and not primarily responsible for handling the upcoming defense witnesses. That was Prasad's job. So Harrison would have had to take on significant work on short notice while battling illness; the likely result would have been further delay. Had Pancholi instead sought additional counsel to help Harrison, that too would have taken time. Further delay would not have served the "prompt" administration of justice. *Mack*, 258 F.3d at 556; *see also Trevino*, 7 F.4th at 429; *Vasquez*, 560 F.3d at 468.

## C.

Lastly, Pancholi argues that the district court violated his right to due process by excluding him from the in-chambers conference with Prasad, Harrison, and Ramamurthy. That claim also fails.

A defendant has "the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987).[4]   Our court has not announced the standard of review by which to judge preserved right-to-presence claims on appeal.   We have, in unpublished caselaw, applied an abuse of discretion standard, borrowing from Eighth Circuit precedent. *See United States v. Moore*, Nos. 20-3497/3499, 2020 WL 6580481, at *2 (6th Cir. July 8, 2020) (order) (citing *United States v. Moe*, 536 F.3d 825, 829 (8th Cir. 2008)).   Other circuits have applied de novo review. *See United States v. Brown*, 945 F.3d 597, 603 (1st Cir. 2019); *United States v. Turesco*, 566 F.3d 77, 83 (2d Cir. 2009); *Valdez v. Gunter*, 988 F.2d 91, 93 (10th Cir. 1993).

Here, however, the proper standard of review does not matter because Pancholi failed to object to his exclusion from the in-chambers conference, and his counsel affirmatively assented to his exclusion.   The government says that constituted a waiver of his right-to-presence claim.   Alternatively, the government argues for invited-error or plain-error review.   Pancholi does not engage the government's invocation of various standards of review.   He says—without elaboration—that the district court "committed structural error by not allowing (or insisting) that Pancholi be present." Reply Br. at 5.   But violation of the right to be present at all critical stages is not structural error. *See Rushen v. Spain*, 464 U.S. 114, 117 n.2 (1983) (per curiam); *Bourne v. Curtin*, 666 F.3d 411, 413 (6th Cir. 2012).   And even if it were, the fact that the violation would constitute structural error does not mean that a defendant cannot waive the underlying right. *See, e.g., Farretta v. California*, 422 U.S. 806, 814 (1975).   And forfeited claims alleging structural error are still subject to plain-error review. *See Johnson v. United States*, 520 U.S. 461, 466 (1997); *United States v. Lawrence*, 735 F.3d 385, 403 (6th Cir. 2013).   Thus invoking structural error does not respond to the government's arguments.   Pancholi never grapples with the fact that no one objected to his exclusion from the conference and that his counsel affirmatively agreed to it.   Therefore, we need not decide which of these three standards applies.   Even applying the most defendant-friendly of the possibilities—plain-error review—it is

---

[4]Federal Rule of Criminal Procedure 43 also grants a defendant the right to be present at "every trial stage." Fed R. Crim. P. 43(a)(2).   However, a defendant need not be present at a "proceeding involv[ing] only a conference or hearing on a question of law." Fed. R. Crim. P. 43(b)(3).

Pancholi's burden to show that he has satisfied this "difficult" test.  *Greer v. United States*, 593 U.S. 503, 508 (2021) (citation omitted).  He has not even tried, so this claim fails.

\* \* \*

For the foregoing reasons, we AFFIRM.